**Max D. ROSENBERG, Plaintiff and Respondent,**

**v.**

**NORTH DAKOTA HOSPITAL SERVICE ASSOCIATION and North Dakota Physicians Service, Defendants and Appellants.**

No. 8207.

Supreme Court of North Dakota.

July 2, 1965.

Conmy & Conmy, Bismarck [A. William Lucas, Bismarck, on oral argument], for plaintiff and respondent.

Wattam, Vogel, Vogel, Bright & Peterson, Fargo, for defendant and appellant, North Dakota Physicians Service.

Nilles, Oehlert & Nilles, Fargo, for defendant and appellant, North Dakota Hospital Service Ass'n.

KNUDSON, Judge.

The defendants appeal from the judgment of the county court with increased jurisdiction for the county of Burleigh and State of North Dakota in favor of the plaintiff for hospitalization and medical benefits under contracts with the defendants, and demand a trial de novo in this court. The case was tried by the court without a jury.

The plaintiff had surgery for gallstones on October 22, 1962, and claims for hospital and medical services under the terms of contracts issued by the defendants were filed by the hospital and clinic. The defendants rejected the claims on the grounds that the hospitalization and surgery was for a condition existing before August 15, 1962, the effective date of Contract No. 185198.

The plaintiff had been examined by several physicians during the year; in January, 1962, for a periodic checkup; in July, 1962, for an insurance policy application; and by Sumner S. Cohen, M.D., of Minneapolis, Minnesota, on September 7, 1962, to whom plaintiff had gone because he was not feeling well, complaining of back and chest pains, followed by stomach pains. The plaintiff received a letter from him, dated October 22, 1962, (when he was in the hospital) diagnosing his general condition, and suggesting further examination, including:

"4. Lower spine and pelvic x-rays
"5. Gastro-intestinal and gallbladder x-rays."

Later, in September, 1962, a physician prescribed Darvon for severe back and stomach

pains. There is no evidence in the record that any of these doctors diagnosed a gallstone condition.

The first diagnosis of gallstones was made by Dr. Daniolos on September 22, 1962, who recommended surgery.

The defendants are separate corporations; one, North Dakota Hospital Service Association, commonly known as the "Blue Cross," provides hospital services, and the other, North Dakota Physicians Service, commonly known as the "Blue Shield," provides medical services.

The defendants, Blue Cross and Blue Shield, are not, strictly speaking, insurance companies, and do not, as such, conduct an insurance business in the State of North Dakota. Blue Cross is authorized to do business under Chapter 26–26, N.D.C.C., and Blue Shield under Chapter 26–27, N.D.C.C. Blue Cross provides hospital service by hospitals, with which Blue Cross has a contract, to subscribers under a contract with Blue Cross for such hospital services. Similarly, Blue Shield provides medical services by licensed doctors of medicine, with which Blue Shield has a contract, to subscribers under a contract with Blue Shield for such medical services. Blue Cross and Blue Shield do not promise to indemnify the subscriber against any loss. The agreement of each is to pay the hospitals and doctors for services rendered to subscribers under the terms of the contracts.

However, the parties tried this action on the theory that the rules governing the construction of insurance contracts are applicable here, and we will follow these rules in the construction of the Blue Cross and Blue Shield contracts in this case.

The defendants (appellants) state that

"The basic (and actually only) question presented in this appeal is whether or not the plaintiff had a 'pre-existing condition' for which no recovery could be had in the first nine months of the policy." [Contracts]

The provisions relating to pre-existing conditions under the terms of Article V, sub-paragraph C, of the Blue Cross contract are:

"ARTICLE V. LIMITATIONS

"Benefits are limited in the following cases to the extent specified:

\* \* \* \* \* \*

"C. For pre-existing conditions, tonsillectomies, adenoidectomies, and treatment of hernias and hemorrhoids:

"Hospital Services for any known or unknown condition which existed before the effective date of this contract and for tonsillectomies, adenoidectomies, and treatment of hernias and hemorrhoids, will be furnished only after this or a prior contract with this Association providing service has been in effect for NINE (9) CONSECUTIVE MONTHS immediately preceding the Subscriber's admission to the hospital."

The terms of Article IV, sub-paragraphs a and b of the Blue Shield contract are:

"ARTICLE IV. EXCLUSIONS.

"Benefits shall not be provided for:

"a. Surgery, Medical and Obstetrical Services, Anesthesia, Pathology, Radiology Examinations and Radiation Therapy services for conditions, known or unknown, which existed before the effective date of this contract until this or a prior contract with this Corporation providing surgical, medical and related services for such conditions has been in effect for nine (9) consecutive months immediately preceding the subscriber's request for such care.

"b. Surgery, Medical, Anesthesia, Pathology, Radiology Examinations and Radiation Therapy services for tonsillectomy, adenoidectomy and treatment of hernias and hemorrhoids of all types, until after the subscriber has been covered under this or a prior con-

tract with this Corporation for nine (9) consecutive months immediately preceding the subscriber's request for such care."

In 29A Am.Jur., "Insurance," § 1156, p. 303, the following statement is made:

"Some insurance policies covering sickness and hospitalization exclude or limit liability in case of a disease originating before a certain time stated in the policy. Such clauses are valid and enforceable. In accordance with the general rule that in determining what losses are covered by disease or sickness insurance, uncertain or ambiguous provisions will be construed most favorably to the insured, the illness, disease, or disability will ordinarily be deemed to have its inception when it first becomes manifest or active or when there is a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the disease, so that recovery can be had even though the infection or disease germs were present in the body prior to the expiration of the excluded period, if they were latent, inactive, and perhaps not discoverable."

In regard to policy provisions precluding recovery for disease originating before a prescribed time, the following language is found in 45 C.J.S. "Insurance" § 893, p. 971:

"Policy provisions precluding recovery for disease or disability originating before a prescribed time have been held to be valid, and such a condition is of the essence of the contract and its fulfillment is a prerequisite to recovery, as where liability is limited to cases where illness begins after issuance of the policy, or at or after a specified period from the date of the policy. Such clauses have been strictly construed against the insurance company, and an illness or disability has been deemed to have its inception when the disease first becomes manifest or active, and not at the earlier time when the medical cause of the disease may have begun or had its origin. Accordingly, such a policy covers losses resulting from illness which first manifests itself after the prescribed period notwithstanding the medical cause thereof antedated such period."

By the plain and unambiguous terms of the contracts here involved, hospital and medical services are not provided for any known or unknown condition which existed before the effective date of the contracts, unless the present contract, or a prior contract, has been in effect for nine *consecutive* months immediately preceding the subscriber's admission to the hospital or request for such medical care. The defendants contend that the gallbladder condition was in existence prior to August 15, 1962, and, therefore, may call up the waiting period clauses as a defense to the plaintiff's claims. As a corollary, if the gallbladder condition was not in existence prior to the effective date of the contracts the waiting period clauses are not available to the defendants as a defense.

The burden was upon the plaintiff to prove that his claim came within the terms of the contracts, and he must establish a prima facie case that after the effective date of the contracts:

1. There was a contract in existence under which he was entitled to benefits for hospital and medical services;

2. He was sick and confined to a hospital; and

3. He had surgery.

And the burden was on defendant to develop facts bringing the case within the exception or exemption, withdrawing from the operation of the policy that which would otherwise be embraced by it. Weber v. Interstate Business Men's Acc. Ass'n, 48 N.D. 307, 184 N.W. 97, 16 A.L.R. 1390; Valencia v. Continental Casualty Co., 127 Neb. 820, 257 N.W. 57; Collins v. United States Casualty

Co., 172 N.C. 543, 90 S.E. 585, 53 A.L.R.2d 692; 29A Am.Jur., "Insurance," §§ 1853, 1854.

The plaintiff has established that the contracts were in existence, and that after the effective date of the contracts he was hospitalized and submitted to surgery for a condition covered by the contracts.

The defendants have not established that the condition of the plaintiff was in existence before the effective date of the contracts, and, therefore, cannot raise the exclusion clause as a defense to the plaintiff's claim.

■ It is generally recognized that provisions in a health or hospital insurance policy requiring that the illness or disease from which the assured suffers originates a specified time after the date of the policy to be within the policy coverage are strictly construed against the insurer and the illness, disease, or disability will ordinarily be deemed to have its inception when it first becomes manifest or active or when there is a distinct symptom or condition from which one learned in medicine can with reasonable accuracy diagnose the disease. Annot., 53 A.L.R.2d 689, and citations.

The only evidence adduced by the defendants is the testimony of Dr. Sedlak, a doctor of medicine in the field of internal medicine, employed by Blue Cross and Blue Shield as a medical consultant, who said, in answer to a hypothetical question concerning pains similar to those experienced by the plaintiff over a period of months, "seen as a clinical sign of gallbladder disease," and, "It is consistent with gallbladder trouble," and a statement in the hospital report that the patient showed a "History of moderately severe epigastric right subcostal pain for 10 months or so, * *."

■ Dr. Sedlak had never examined or treated the plaintiff, and his testimony falls short of proving that the condition of the plaintiff became manifest or active before the effective date of the contracts.

The pain and discomfort intermittently experienced by the plaintiff over a period of some time may be attributed to other causes having similar symptoms, and in 4 L.Med.Cyc., § 30.132, the symptoms of chronic cholecystitis are discussed:

"The signs and symptoms are intermittent but varied and may range from distress following meals to severe colic. Pain may be situated in the epigastrium (pit of abdomen) or in the right upper quadrant, and, rarely, it may simulate cardiac distress, or even aggravate cardiac disease which is present. Classically, the pain is of intermittent nature and may radiate to the back, shoulder, or scapular region.

"Physical signs may be few or many. They may range from nothing more than slight right upper quadrant tenderness to extremes that simulate acute cholecystitis. Usually the gallbladder, being fibrotic, is not palpable. In the absence of jaundice, there are no noteworthy laboratory findings. The diagnosis is confirmed by cholecystography (X-ray). There are other forms of intraabdominal pathology and even of functional disease which closely simulate the clinical findings of gallbladder disease."

The plaintiff's condition had not been diagnosed as gallbladder trouble by any of the doctors examining him before the effective date of the contracts, and in January 1962, when he was examined by Dr. Dunnigan and found to be in general good health the prior contracts were in force. Dr. Arneson, who examined him in July 1962, in connection with an insurance application, made no diagnosis of gallbladder trouble.

Dr. Cohen, who had examined the plaintiff on September 7, after the effective date of the current contracts, in his letter of October 22 to the plaintiff, reported the

results of his examination and made certain diagnoses, including "Back—suggestive of lumbar disc," and made certain recommendations for additional laboratory procedures to be done in Bismarck, including:

"4. Lower spine and pelvic x-rays

"5. Gastro-intestinal and gallbladder x-rays,"

and suggested a reducing diet, continuation of Dexedrine, and reduced coffee drinking and cigarette smoking. But he does not report having made a diagnosis of the plaintiff's condition as chronic cholecystitis and cholelithiasis, nor does he refer to any gallbladder trouble except to recommend gallbladder x-rays. This report is confirmed by Dr. Cohen's letter to Dr. Sedlak wherein he reported the following diagnoses (among others) were made:

"6. Lumbar disc syndrome

"7. Rule out gallbladder disease,"

and made the same recommendations, for x-rays to be taken, a strict reducing diet and marked reduction to abstinence from smoking and coffee.

The term, "Rule out gallbladder disease," means, according to Dr. Sedlak's testimony:

"That is a common term used in the medical profession to alert the doctor not to rule out gallbladder disease."

The plaintiff testified that he consulted Dr. Cohen because of "Back pains and being extremely tired and at times a pain extending from the back into part of the stomach area;" and that it was the same complaints that caused him to consult Dr. Heffron, who prescribed Darvon to alleviate the pain; and then, on September 22, to consult Dr. Daniolos, who diagnosed his condition as chronic cholecystitis, he being the first physician to diagnose his condition.

The clinical history sheet shows that two x-rays were taken and that a gallbladder shadow was not obtained at either examination.

The defendants cite Dowdall v. Commercial Travelers Mutual Accident Association of America, 344 Mass. 71, 181 N.E. 2d 594, in support of its position that the condition of the plaintiff was in existence before the effective date of the policy, and, therefore, the defendant was not precluded in calling up the exclusion clause in defense of the claim of the plaintiff. In the Dowdall case the insured was the holder of an insurance policy issued by the defendant on November 10, 1952. He became totally disabled from December 18, 1958, and was so at the time of the trial, from multiple sclerosis. The physician testified that he "had been the defendant's [sic] [plaintiff's] physician from 1944 to 1958." The physician testified that

"* * * he 'had reasonable cause to believe that the plaintiff had multiple sclerosis in 1946, 1947, 1948—along in there'; that he did not tell the plaintiff that he had the disease; that as late as 1952 the plaintiff did not know that he had it; and that a definite diagnosis was made in 1955."

The court held that the plaintiff could not recover because, on the basis of the foregoing evidence, the plaintiff's disability resulted from a disease "originating" several years prior to the issuance of the policy.

The Dowdall case may be distinguished from the instant case because the facts are different. In the Dowdall case the symptoms of the disease had become manifest or active, from which the physician had diagnosed the disease, *before the date of the issuance of the policy.* Quoting from Dowdall at page 596 of 181 N.E.2d:

"Thus, it has generally been held in construing policies of this type that the origin of a sickness or disease is deemed to be the time when it first becomes manifest or active, or when there is a distinct symptom or condition *from which one learned in medicine can diagnose the disease.* [Italics ours] See note, 53 A.L.R.(2d) 682,

689. Here that test has been satisfied for the symptoms of the disease had become manifest long before the issuance of the policy."

In Broccolo v. Horace Mann Mutual Casualty Co., 37 Ill.App.2d 493, 186 N.E.2d 89, also cited by defendants in support of their position, the facts are not the same, and may be distinguished from the instant case in that the condition or illness of the plaintiff was diagnosed by her physician before the date of the issuance of the policy, and that he continued to treat her up to the time that he performed the operation for her illness, whereas in the instant case no physician had made a diagnosis of the plaintiff's condition prior to the date of the issuance of the contracts. In Broccolo the attending physician who performed the hysterectomy stated that he first attended the plaintiff in November 1955; that the nature of her illness was "fibromyomatous uterus"; and in response to the question, "If illness, how long prior to your first examination was the disease contracted or begun?" he answered, "Bleeding for six months." He subsequently treated her "about once every two months." The policy of insurance was issued in December 1955, and the hysterectomy was performed in August 1956.

In the instant case there was no evidence that the condition of the plaintiff had become manifest or active, or a distinct symptom or condition occurred *from which one learned in medicine could diagnose the disease*, before the date of the issuance of the contracts.

The judgment of the county court is affirmed.

TEIGEN, Acting C. J., ERICKSTAD and STRUTZ, JJ., and CLIFFORD JANSONIUS, District Judge, concur.

BURKE, C. J., deeming himself disqualified did not participate; CLIFFORD JANSONIUS, District Judge, sitting in his stead.