SHAKER MEDICAL CENTER HOSPITAL *v.* PHILLIPS ET AL.

(No. 77 CI F2858—Decided January 11, 1978.)

Shaker Heights Municipal Court.

*Mr. Jerold S. Cook,* for plaintiff.
*Mr. Robert Phillips, pro se.*
*Ms. Carol H. Lamm,* for third-party defendant.

ROCKER, J. Plaintiff rendered services in its Emergency Room to defendant, Phillips, in the early morning hours of September 27, 1976. The services consisted of taking a brief medical history, simple physical examination procedures such as blood pressure, temperature, pulse beat and other similar routine tests, all of which was done in a period of approximately one-half hour.

Upon completion of the examination, the hospital resident advised defendant to come back later in the day for further examination to "rule out peptic ulcer disease." Plaintiff was given a dosage of "Maalox" to relieve intestinal distress and was also administered "Percodan," a drug for relief of pain; he was then released from the hospital.

The hospital later submitted its fee bill to third-party defendant, Blue Cross of Northeast Ohio, in the amount of $62. Blue Cross rejected the claim as one not

covered under its policy with the state of Ohio for the benefit, of state employees and qualifying members of their families. The hospital, thereupon, directed its billing to defendant, Phillips, who upon being sued by plaintiff, joined Blue Cross as a third-party defendant.

Blue Cross of Northeast Ohio furnishes to each person covered under its group hospital and major medical policy a "benefits" book which outlines the coverages afforded. Among those coverages is one described as "treatment of a medical emergency."

The benefits booklet defines under what circumstances a "medical emergency" compensable under its policy exists. The definition is as follows:

"Benefits are provided for the treatment of a medical emergency. A medical emergency will be considered to exist when there is a sudden and unexpected onset of a serious medical condition with symptoms so severe as to cause a person to seek immediate medical attention regardless of the hour of the day or night and when failure to obtain immediate medical care would cause serious harm to the patient's health or jeopardize his life. To qualify for medical emergency coverage, the patient must have a sudden, unexpected condition which involves actual hazard to his life or health.

"The situation must involve a true emergency according to the following guidelines:

"—The medical emergency must be sudden and unexpected with severe symptoms which causes you to seek immediate aid or treatment.

"—The illness or condition as finally diagnosed and/or as indicated by its symptoms must be one which would normally require immediate medical care.

"Examples of such conditions or cases are heart attacks, strokes, poisonings, respiratory distress, suffocation, convulsions, hemorrhage, unconsciousness, diabetic acidosis, spontaneous lung collapse, acute appendicitis, acute severe infections, or heat prostration.

"Chronic conditions, that is, conditions of long duration or frequent occurrence, generally, would not qualify

for medical emergency coverage unless there was an acute attack which would seriously jeopardize the life or safety of the patient."

The patient medical history taken by the hospital physician relates the fact that defendant had a history of duodenal ulcer. At trial that history was more adequately described when defendant testified that the prior ulcer experience was incurred while in the military service some seven years ago. He further related that medical treatment at that time effectively healed the ulcer and that he had no other episodes of the illness since then.

Additional facts relating to the cause of defendant coming to the emergency room of the hospital at 4:45 a. m. were elicited at trial as follows:

1. Two nights previous to coming to the hospital, defendant had consumed a substantial amount of alcoholic beverages at a social function.

2. The night before coming to hospital, defendant had eaten a heavily-spiced dinner.

Based upon those facts and examination, the emergency room physician reported his impression of the patient's illness as "Gastritis—R/O PUD" which was translated at trial to mean that the doctor's opinion was that the patient had an inflammation of the stomach and that further examination was recommended to rule out peptic ulcer disease.

The emergency room physician reported no evidence of heart attack, stroke, poisoning, hemorrhage, suffocation or any one of the other examples set forth in the guidelines of a "true emergency."

Based upon the medical report, a physician employed parttime by Blue Cross as a medical review consultant rendered an opinion that no emergency existed.

The consultant's view is succinctly stated in his testimony: "From the record that we have, I cannot state that he had any hazard to his life or was [in] an emergency situation."

Later in cross-examination, the same witness was asked: "And absent any further medical substantiation other

than this emergency medical report, can you really say what was wrong with that patient that night?" The witness responded: "No." In answer to the another question, the witness testified that the emergency room physician according to the report suspected a gall bladder attack.

With respect to defendant, Phillips, seeking relief from pain during the night, the medical consultant stated that "often people wake up with something in the middle of the night and medically it certainly may not be an emergency situation, *but to the patient it is* and we have to factor that in." (Emphasis added.)

The medical consultant continued with: "* * * because I may wake up—or somebody not being a doctor may wake up with a severe headache, as a layman, I may think I am having a stroke and I rush to the emergency room but its only headache and here, again, we get caught in this problem of using the emergency room as an out-patient service rather than a true emergency."

When asked whether the consultant had an opinion as to the completeness of the physical examination given the patient, he responded that for the problem presented it was complete although no cardiogram or chest x-ray was administered.

Those responses indicate that coverage under the policy for emergency room services is a subject for decision first by the patient. He must make an evaluation of his symptoms and decide upon the risk of jeopardizing his life or health or expending the funds for a physician's evaluation at an emergency room.

The consultant further in his testimony confirmed the fact that a patient who comes in with a duodenal ulcer history is one in whom the physician looks for *some emergency developing* in regard to that disease. The consultant stated: "Now, as far as emergency problems or complications from a duodenal ulcer, the main ones we run into are perforation of the ulcer, which would present an *acute abdonminal catastrophe* with severe pain, and *there are certain physical findings* that would indicate rupture of the ulcer." (Emphasis added.)

The consultant listed numerous other symptoms which would present serious emergency situations with respect particularly to a patient having a history of duodenal ulcer disease, symptoms which physicians, generally, are trained to recognize.

In analyzing this case, the contract and the evidence, the court is impressed with the portion of the syllabus of *Rosenberg* v. *North Dakota Hospital Service Assn.* (1965), 136 N. W. 2d 128, wherein the court held:

"In an action for benefits under hospital and medical service contracts, the defendants have the burden to prove that an exception or exclusion clause of the contract applies."

In addition to the matter of proof, the court must, of course, consider the contract itself with respect to any interpretation of its terms permissible under law.

Only if the court finds that the meaning and purpose of a contract is unclear upon its face, may it enter upon the enterprise of construction. In the contract before the court, the court does not find ambiguity as to whether there was a promise to provide emergency medical service; the ambiguity found is as to the circumstances under which that promise becomes effective and obligatory.

In the interpretation of that ambiguity the court is bound by the accepted principle of law that construction of the language, intent and purpose of the contract must be applied liberally in favor of defendant third-party plaintiff, Phillips, in this instance, and strictly against defendant Blue Cross herein.

The medical consultant testified broadly on the purpose of the definition of "emergency" as designed to discourage people using the emergency room in place of consulting a private physician.

The language of the contract, however, would appear to have the purpose of discouraging the use entirely of emergency services unless the policy holder is approaching imminent death or at least an illness which would seriously jeopardize future health.

The court does not believe that, regardless of the lan-

guage, such was the intended purpose of the emergency clause. Yet, a strict construction of the language, if construed favorably to Blue Cross, would inevitably lead to concluding that such a purpose was intended. Construing the language liberally in favor of defendant third-party plaintiff, Phillips, however, would lead to a conclusion that if he met some, but not all of the criteria of an emergency, he was covered under the policy.

With respect to the criteria, the court finds that the mere fact that defendant Phillips had suffered from a peptic duodenal ulcer seven years ago, did not preclude a medical emergency arising suddenly and unexpectedly. The fact that the patient had experienced some pain several days prior to coming to the hospital, does not mean that at its onset it was not sudden. As to it being unexpected, the contract is completely vague as to how a determination is made when to expect pain, other than in cases of injury.

One of the criteria in the contract was clearly met when defendant third-party plaintiff, Phillips, presented himself at the hospital at 4:45 a. m. complaining of symptoms "so severe as to cause a person to seek immediate medical attention regardless of the hour of the day or night."

That Phillips was suffering pain of a severe nature is evident from the emergency room medical report which stated that he was administered Percodan in the hospital and given a prescription for additional Percodan, which was identified as a drug for relief of pain.

As to the condition causing Phillips' pain and its final diagnosis, the hospital physician recommended further examination to rule out such serious diseases as described by the consultant as possible gallbladder attack and peptic ulcer disease. However, the contract provides an alternative to such final diagnosis wherein it states that the illness or condition be one which would normally require immediate medical care. Here, again, a strict interpretation of that language would require that the patient be wheeled into an operating room upon entering the hospital or at least be submitted to extensive X-ray and other examinations just prior to such radical treatment. No such intention of the

parties is to be found in the contract. The court would construe the language to mean that the illness or condition be one of a nature that if diagnosed as, for example a gall-bladder attack, bleeding ulcer, or perforated ulcer, it presents an instance where immediate medical care would normally be required. There is no question that the emergency room physician was of the opinion that the sypmtoms were of a nature that could possibly lead to a diagnosis of the aforementiond diseases.

The court recognizes the fact that under the contract Blue Cross does not contract to furnish ordinary, run of the mine medical service. It is probable that definition of that exclusion can be expressed without depriving the policyholder of an important service for which a hospital group insurance policy is offered.

The contract must, also, be considered in the light of surrounding circumstances at the time of its execution. It is eminently commonplace and widely known that physicians, generally and with rare exceptions, do not make what was once known as "house calls." Under such circumstances, persons suffering pain are fortunate if they experience illness and pain during office hours of a physician. Otherwise, the source of relief is substantially limited to a hospital emergncy room for determination of the seriousness of the illness by a medically-trained individual and the treatment required.

Judicial notice may be taken, in this court's opinion, of the foregoing conditions respecting medical aid availability in this general community area. It is the opinion of the court that the foregoing conditions are within common knowledge to such an extent that more speedy expedition of trial may be had by not requiring proof of such a condition in this case. (See *Strain* v. *Isaacs* (1938), 59 Ohio App. 495, 18 N. E. 2d 816).

The contract with Blue Cross of Northeast Ohio under which this action is brought is one executed by the state of Ohio for the benefit of its many thousands of employees. The employees do not individually negotiate the terms of the agreement. They place reliance upon the representa-

28

tions made as to policy coverages upon a booklet prepared by Blue Cross. Exhibit No. 1, the booklet in this case, includes a letter from the then Governor of Ohio, Hon. John J. Gilligan, in which it is indicated that one of the reasons for the state switching to Blue Cross was because of "expanded coverage for medical emergencies." As pointed out earlier in this opinion, a strict interpretation of the language of the contract would almost negate emergency medical service unless the patient is in extremis. Certainly, then, the Governor's statement published by a party to the contract, Blue Cross, would constitute a representation of liberality in emergency medical cases and not the restrictive extremes advanced by third-party defendant herein.

Upon the foregoing reasons and findings, the court orders judgment to be entered in favor of plaintiff, Shaker Medical Center Hospital, against third-party defendant, Blue Cross of Northeast Ohio, in the sum of $62 and costs.

*Judgment for plaintiff.*