Nancy **GOLDSTEIN**, et al., Plaintiffs,

v.

**D.D.B. NEEDHAM WORLDWIDE, INC.,**
**et al., Defendants.**

No. **C–1–88–680.**

United States District Court,
S.D. Ohio, W.D.

June 14, 1990.

mentioned within this footnote is hereby de-    nied.

**462**

Stanley M. Chesley, Ronald J. Goodman, Cincinnati, Ohio, for plaintiffs.

James E. Pohlman, Columbus, Ohio, Jeffrey J. Harmon, Cincinnati, Ohio, Debra S. Davy, Chicago, Ill., for defendants.

## ORDER

HERMAN J. WEBER, District Judge.

This matter is before the Court upon defendants' D.D.B. Needham Worldwide, Inc. and Omnicon Group, Inc.'s Motion for Summary Judgment (doc. no. 53) and Renewed Motion for Summary Judgment (doc. no. 73). Memoranda in opposition to and in support of such Motions have been filed by the parties (doc. nos. 59, 76, 77). On Friday, January 19, 1990, a hearing was held on such Motions at which time all parties presented their respective positions.

## I. RELEVANT FACTS

The plaintiffs in this action are Nancy Goldstein, suing both in her capacity as surviving spouse and as Co–Executor of the Estate of Robert V. Goldstein ("Goldstein"), and Ronald J. Goodman, Co–Executor of the Estate of Robert V. Goldstein. At all times relevant to this action, Goldstein was domiciled in and was a resident of Ohio.

The defendants are Omnicom Group, Inc. ("Omnicom") and its wholly-owned subsidiary, D.D.B. Needham Worldwide, Inc. ("Needham"). Omnicom was and remains a corporation, organized and incorporated under the laws of New York with its principal place of business in New York. Needham was and remains a corporation, organized and incorporated under the laws of New York with its principal place of business in New York.

Robert V. Goldstein's death occurred during a five-day whitewater rafting and fishing adventure trip to British Columbia, Canada when he was thrown from the raft in which he was travelling on the Chilko River. It is alleged that "[Goldstein] suffered hyperventilation due to the cold water temperature and/or hypothermia and ultimately death by drowning."

Goldstein was a resident of Cincinnati, Ohio and employed by The Procter & Gamble Company in Cincinnati. Goldstein became Vice–President of Advertising at Procter & Gamble in 1979. At that time, Procter & Gamble was a major client of Needham. The companies conducted busi-

ness together in Ohio. While Vice–President, Goldstein received four (4) invitations from Al Wolfe ("Wolfe"), President of D.D.B. Needham Worldwide, to participate in business outings sponsored and organized by Needham. These business outings involved "outdoor adventure" trips with whitewater rafting offered to the participants. Among the rivers visited on these outings were: the Middle Fork of the Salmon River in Idaho in 1979 and the Selway River in Idaho in 1983. The guide for both of these trips was Steve Currey of Provo, Utah. Goldstein participated in both of these trips. In 1985, Wolfe invited Goldstein to participate in a third trip, this time to the Chilko River in British Columbia. Goldstein did not accept this invitation.

In early 1987, Wolfe initiated the planning and scheduling of a five-day trip to the Chilko River in British Columbia. Goldstein was invited by Wolfe (the fourth invitation) to participate in this business outing to be held from July 29 to August 2, 1987. Wolfe handled all necessary arrangements, including the selection of the guide. He selected Ronald J. Thompson ("Thompson") of Thompson Guiding Ltd., a resident of British Columbia. This trip was arranged and sponsored to advance the business purposes of the defendants. The Court observes that at the time of the trip, Proctor & Gamble was no longer a client of Needham, having severed its business ties in 1986.

Eleven individuals participated in this trip. In addition to Wolfe and Goldstein, the participants included Stuart Sharpe and Gene Yovetich, both of whom were employees of Needham; James Fasules, a retired employee of Needham; Richard O'Reilly, an advertising executive from Greenwich, Connecticut; Earl Madsen, a partner in a law firm in Golden, Colorado; Michael Miles, President and Chief Executive Officer of Kraft, Inc.; Arthur Zeikel, President of Merrill Lynch Asset Management, Inc.; John Collins, President and Chief Operating Officer of the Clorox Company; and Joseph Morrison, Vice–President of Marketing for Mattel, Inc.

The eleven participants met at the airport in Vancouver, British Columbia before taking chartered planes to Chilko Lodge on Wednesday, July 29, 1987. While in the Hudson Terminal of the Vancouver Airport, Wolfe requested Stuart Sharpe, who had never rafted on the Chilko River prior to this trip, to circulate a written instrument to each participant for his signature. The participants had no prior opportunity to review this instrument. Wolfe was not present when it was circulated and signed by the participants. The guide for the trip, Thompson, was not present at the airport when the written instruments were presented, reviewed and signed by the participants. Goldstein had never met Thompson before he signed the instrument.

Goldstein purchased fishing gear in Vancouver on July 29, 1987 and also purchased a fishing license at Chilko Lodge on that same day. Goldstein chose to go fishing rather than join the group of six invitees who went whitewater rafting on Thursday and Friday, July 30 and 31, 1987, the first and second day of the Chilko trip.

On Saturday, August 1, 1987, however, Goldstein, the ten other participants and the guide boarded the raft. Their destination was the Chilko Lodge, downstream from their campsite. As they were travelling down the Chilko River, upon entering what is called the "White Mile" stretch of the river, a large and very powerful wave broke onto and into the starboard fore section of the raft pushing it to the left side of the river channel causing the raft to hit a boulder in the river. When the wave broke over the raft, it was essential that the passengers immediately engage in "high siding" in the raft to avoid disaster. No one effectively executed the "high siding" maneuver. Eleven of the twelve passengers, including the guide, fell into the water. Five of those eleven died.

## II. SUMMARY JUDGMENT STANDARD

The Court has reviewed the arguments made by the Parties and has applied the principles of controlling law to the facts presented. The legal standard for consid-

eration and disposition of issues on summary judgment is well settled.

■ Summary Judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c). The evidence presented on a motion for summary judgment is construed in favor of the party opposing the motion who is given the benefit of all favorable inferences that can be drawn therefrom. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (original emphasis).

■ Summary judgment should not be granted unless it is clear that a trial is unnecessary. The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id.*

■ The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 472, 82 S.Ct. 486, 490, 7 L.Ed.2d 458 (1962). "[T]he issue of material fact required by Rule 56(c) ... to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of

the truth at trial." *First National Bank v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir.), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979), the United States Supreme Court has recently stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). According to the Supreme Court, the standard for granting Summary Judgment mirrors the standard for a directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id.* at 323, 106 S.Ct. at 2552; *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Catrett*, 477 U.S. at 322, 106 S.Ct. at 2551. Significantly, the Supreme Court also instructs that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence. *Id.; Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. Rule 56(e) requires plaintiff to go beyond the pleadings and by his own affidavits, designate "specific facts showing that there is a genuine issue for trial." *Id.*

■ Further, there is no express or implied requirement in Fed.R.Civ.P. 56 that the moving party support its motion with affidavits or similar materials negating the

opponent's claim. *Id.* Fed.R.Civ.P. 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits." Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories and admissions on file.

## III. CHOICE OF LAW

Defendants initially request that the Court make a determination as to which jurisdiction's substantive law will be applied to the affirmative defenses concerning the effect of the release and the decedent's assumption of the risk. Defendants' position is that British Columbia has the most significant relationship to this case. Therefore, Ohio choice of law requires that British Columbia law be applied to a consideration of these affirmative defenses. Conversely, plaintiffs suggest that the defendants have conceded that there is no conflict of law issue as both British Columbia law and Ohio law are the same, and if such an issue did exist, Ohio choice of law rules mandate application of Ohio law.

In response, defendants do not concede that the law of British Columbia and the law of Ohio are the same with regard to the effectiveness of the release and Goldstein's assumption of the risk. Rather, the defendants assert that the application of the rules of law of both British Columbia and Ohio produce the same result. The defendants do concede, however, that separate choice of law determinations may be made on all of the legal issues involved.

All parties recognize that a federal court sitting in a diversity action must apply the choice of law rules of the state in which it presides and, accordingly, Ohio choice of law rules apply. *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Traditionally, it was well established in this state that the substantive law of the place where the injury occurred was controlling under the rule of *lex loci delicti. Freas v. Sullivan,* 130 Ohio St. 486, 200 N.E. 639 (1936); *Collins*

*v. McClure,* 143 Ohio St. 569, 56 N.E.2d 171 (1944); *Ellis v. Garwood,* 168 Ohio St. 241, 152 N.E.2d 100 (1958); *Lyons v. Lyons,* 2 Ohio St.2d 243, 208 N.E.2d 533 (1965). The application of this rule had been automatic without regard to the facts of the case.

Beginning in 1971 and cases decided thereafter, the Ohio Supreme Court moved to join the majority view which does not rigidly and automatically apply the doctrine of *lex loci delicti* to determine the applicable state law. *Fox v. Morrison Motor Freight,* 25 Ohio St.2d 193, 267 N.E.2d 405 (1971), *cert. denied,* 403 U.S. 931, 91 S.Ct. 2254, 29 L.Ed.2d 710 (1971); *Schiltz v. Meyer,* 29 Ohio St.2d 169, 280 N.E.2d 925 (1972); *Moats v. Metropolitan Bank of Lima,* 40 Ohio St.2d 47, 319 N.E.2d 603 (1974).

In *Morgan v. Biro Mfg. Co.,* 15 Ohio St.3d 339, 474 N.E.2d 286 (1984), the Supreme Court of Ohio answered the query, "what specific factors should the court consider in making an equitable choice-of-law determination?" The methodology to be applied is the Restatement of the Law of Conflicts approach. *Morgan, supra* at 341, 474 N.E.2d 286. The analysis begins with Section 146, which contains a presumption that the place of the injury controls unless another jurisdiction has a more significant relationship to the litigation. *Id.* To determine the state with the most significant relationship, a court should consider the general principles set forth in Section 145 which are:

(1) the place of the injury;

(2) the place where the conduct causing the injury occurred;

(3) the domicile, residence, nationality, place of incorporation, and place of business of the parties;

(4) the place where the relationship between the parties, if any, is located;

(5) any factors under Section 6 which the Court may deem relevant.

All of these factors are to be evaluated according to their relative importance to the case.

This Court notes that the additional factors set forth in Section 6 are as follows:

(a) the needs of the interstate and international systems;

(b) the relevant policies of the forum;

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

(d) the protection of justified expectations;

(e) the basic policies underlying the particular field of law;

(f) certainty, predictability and uniformity of result, and;

(g) ease in the determination and application of the law to be applied.

## IV. THE "RELEASE"

■ In this action, the written document affects the legal rights of Goldstein's Estate, his surviving widow and heirs, Omnicom and Needham. At all times relevant to this action, Goldstein was domiciled in Ohio. Omnicom and Needham are corporations, organized and incorporated under the laws of New York with their principal places of business in New York. Needham is a wholly-owned subsidiary of Omnicom.

The written document was signed by Goldstein on July 29, 1987 at the Vancouver Airport. The instrument states:

### RELEASE

In consideration of travel arrangements made for me by Ron Thompson Guiding, and other good and valuable consideration, receipt of which is hereby acknowledged, I hereby release and discharge Ron Thompson Guiding, DDB Needham Worldwide, Inc., and Al Wolfe or other of their respective officers, directors, agents, employees, and other representatives from and against any liabilities, damages, losses costs or expenses, including reasonable attorney fees, arising out of personal injury or property or other damage arising out of my [Goldstein's] participation in the trip to Chilko Lake and the Chilko River on July 29, 1987, whether arising before, during or after such trip. I represent and warrant that neither I nor my heirs, successors or assigns shall make any claim against any of the persons named herein. I will provide my own insurance coverage at my own expense.

I am of legal age, have read and fully understand the terms of this Release and am free to enter into this Agreement.

The Court observes initially that Omnicom is not specifically mentioned in this document. Ronald J. Thompson and Thompson Guiding Ltd., the only British Columbia residents, are not parties to this action. Moreover, there is no indication that the purpose of distributing the document at the airport in Vancouver was to consummate a contract between these parties bound by British Columbia law.

The practice employed by Wolfe in the past was to circulate such an instrument to the participants in advance of their initial gathering in their respective states of domicile. The letter of July 7, 1987, from Wolfe to "the Fellow Masochists" indicates that procrastination was a factor in planning the Chilko River trip. This Court likewise concludes that procrastination was the only reason distribution of the instrument for the participation in this trip to the Chilko River was given at the last minute in British Columbia.

The document states that it covers participation *before*, during and *after* the trip. Certainly, the participant's actions occurring prior to their arrival in British Columbia, and after the trip on their return home, actions which would occur outside of British Columbia, were not intended to be the subject of British Columbia law.

Moreover, these individuals had already arrived in Vancouver, committed themselves to participating in the trip without having had an opportunity to review this document, and were given no notice or time to obtain any insurance coverage as required by the instrument. Again, this confirms that the instrument was to be distributed and signed at their homes in accordance with the past practice prior to the participant's initial gathering at the Vancouver airport. Certainly it is unreasonable to presume they were to arrange for trip or liability insurance on the spur of the

moment at the Vancouver airport to cover their responsibilities stated in the instrument. This Court also notes its concern with: the method the instrument was distributed; the potential for duress and undue influence on all of the individuals; and, the lack of information available to the participants about the risks and potential dangers involved in the trip necessary to make an appreciable and knowledgeable consent to such instrument.

It is indeed reasonable to conclude that Goldstein would expect that the laws of Ohio, his state of domicile and citizenship, would protect the rights of his family and apply to a determination of the validity and enforceability of the instrument, especially since the instrument was silent as to the choice of the law which would control. Upon review of the record and in accordance with the above factors, this Court concludes that Ohio has the most significant and compelling interests. Accordingly, the law of Ohio controls the instrument and its effect on this action.

## A. APPLICABLE LAW

It is the defendants' position that even under Ohio law, the "release" is binding upon the decedent and bars the present action. Plaintiffs, on the other hand, have asserted a number of arguments; the "release" does not protect Omnicom; the "release" does not include willful and wanton misconduct; the "release" is not binding upon Goldstein's survivors and therefore does not bar plaintiffs' claims for wrongful conduct; and finally, the "release" is overly broad, vague and ambiguous.

■ A release ordinarily operates to extinguish a right which is the subject thereof in exchange for some consideration and effectively operates as an estoppel or a defense to an action by the releasor. 15 Ohio Jur.3d, *Compromise, Accord, and Release*, § 43 (1979). As such, it is a contract between two parties enforceable at law subject to the rules governing the construction of contracts. *Id.* Whether a release operates upon a certain liability depends entirely upon the intention of the parties, which is to be gathered from the

language of the release and the state of facts then existing. *Whitt v. Hutchison*, 43 Ohio St.2d 53, 58, 330 N.E.2d 678, 682 (1975) (citations omitted). The law cannot effect the release of an obligation when such release would operate contrary to the manifest intention of the parties. *Id.*; 15 Ohio Jur.3d, *supra*.

■ This Court acknowledges that where there are general words alone in a release, they shall be construed most strongly against the releasor. *Id.*; *Shaker v. Phillips*, 54 Ohio Misc. 21, 25, 376 N.E.2d 983 (1978). Yet, when an instrument is so general in terms as to release the rights of a party to which the releasee was ignorant, and which the releasee did not contemplate at the time the bargain was made, the instrument will be restrained to the purposes of the bargain, and the release confined to the right(s) intended to be released. 15 Ohio Jur.3d, *supra*.

In sum the Parties are bound by the terms of the written instrument. Although this instrument is entitled "release", this Court is convinced that it is rather a contract of indemnity. It states, in part, "... I hereby release and discharge ... from and against any liabilities ... arising out of ... damage arising out of my participation in the trip."

This language, when read with the representation, "I will provide my own insurance coverage at my own expense," suggests that Goldstein intended to indemnify the defendants from damages arising out of his participation in the trip. Additionally, the only language in the instrument relating to the claims which are presently before this Court is as follows: "I represent and warrant that neither I nor my heirs, successors or assigns shall make any claim against any of the persons named herein." This is, at best, Goldstein's agreement to indemnify the named defendants from claims by the plaintiffs. It is not a release of any future claims of his heirs or his estate.

■ It is long settled that where contracts of indemnity purport to relieve one

from the results of his failure to exercise ordinary care, they shall be strictly construed and will not be held to provide such indemnification unless so expressed in clear and unequivocal terms. *Kay v. Pennsylvania Railroad Co.*, 156 Ohio St. 503, 103 N.E.2d 751 (1952); *Dingledly Lumber Co. v. Erie Railroad Co.*, 102 Ohio St. 236, 131 N.E. 723 (1921).

■ In such light, this Court finds that this issue cannot be resolved by summary judgment. While the validity of exculpatory agreements is certainly recognized, this written instrument does not indicate any specific risks which will be encountered by a participant on this trip. There is absolutely no mention of whitewater rafting as an activity to be undertaken on this trip, any of the potential risks and dangers involved in whitewater rafting, or mention of any other activities to be undertaken on this trip. The failure to specifically provide for whitewater rafting questions raises issues of fact, such as: whether Goldstein knew whitewater rafting was planned, particularly on Saturday, August 1, and whether he intended to partake in the activity if it had been required. Moreover, the time and place in which this written instrument was executed does in no way contemplate that Goldstein was advised of or appreciated the risks involved in what he would be subjected to on the Chilko River. Although Goldstein had attended rafting trips in the past, it is reasonable to conclude that Goldstein did not intend to participate in any rafting while on this trip.

The parties are also in disagreement as to whether Wolfe informed the participants that whitewater rafting was mandatory prior to August 1, 1987. The letter of July 7, 1987, does not state that rafting was mandatory nor does it describe the dangers and risks of Lava Canyon. Wolfe was not present when the participants signed the written instruments and Sharpe had never been to the Chilko River prior to this trip. Finally, this particular river, the Chilko River, involved much greater and more appreciable risks than any river previously encountered by Goldstein. Accordingly,

this Court DENIES defendants' Motion for Summary Judgment on this defense.

## V. ASSUMPTION OF THE RISK

■ Defendants have also argued that Goldstein's voluntary participation in and encountering of the open and obvious risks associated with whitewater rafting constitute an assumption of the risk and therefore bar plaintiffs from recovering against Defendants. The basis of defendants' argument is that under British Columbia law application of the assumption of the obvious risks necessarily associated with whitewater rafting and the application of the traditional assumption of risk or *volenti* defenses precludes a recovery. In the alternative, defendants assert the same result under Ohio law; a defendant cannot be held liable for failing to protect another from open and obvious risks.

In opposition to this position, plaintiffs assert that the defense of assumption of the risk does not bar plaintiffs' claim as a matter of law.

This Court must initially determine the jurisdiction which has the most significant relationship to this affirmative defense and apply that law. Defendants' position that the results will be the same whether Ohio or British Columbia law applies raises the consideration that the parties will not be prejudiced by the application of Ohio law. The application of Ohio law to the issue of assumption of the risk would provide certainty, predictability and uniformity of result and is consistent with the applicable law to the defense provided by the "release." The safety of and regulation of its waterways, however, are of utmost concern to British Columbia. Since the accident took place in British Columbia, the Court concludes that the overriding considerations in this action mandate the application of *British Columbia* law to this affirmative defense.

### A. APPLICABLE LAW

■ The defendants assert that the natural condition of the Chilko River with its whitewater rapids, rocks and boulders presented open and obvious dangers.

Therefore, by participating in the Chilko whitewater rafting trip, the decedent assumed the risks inherent in the activity and defendants owed no legal duty to protect him from those risks.

Conversely, plaintiffs assert that the central issue in this defense is whether this individual was fully apprised of the activity in which he participated and whether the risks were fully disclosed prior to undertaking those risks.

Under the laws of British Columbia, the defense of voluntary assumption of risk is based upon the moral supposition that no wrong is done to one who consents. *Crocker v. Sundance*, 44 C.C.L.T. 225, 239 (1988). This defense is more precisely referred to as *volenti non fit injuria*. (Translated as "to one who is willing no harm is done). *Dube v. Labar*, 2 B.C.L.R. (2d) 273, 276 (1986). By agreeing to assume the risk, the plaintiff absolves the defendant of all responsibility for it. *Crocker, supra*. As Defendants astutely noted and this Court quotes:

> The burden is on the defendant, in each case, to prove that the plaintiff, expressly or by necessary implication, agreed to exempt the defendant from liability for any damage suffered by the plaintiff, occasioned by the defendant's negligence. In every case the question is whether the plaintiff gave an express or implied consent to accept or assume the risk without compensation. In other words, did the plaintiff really consent to absolve the defendant from his common law duty of care, saying or implying, in effect, 'I am prepared to take the risk of your negligence and if I am injured you will not be legally responsible for my damages.' The question is not simply whether the plaintiff knew of the risk, but whether the circumstances were such as necessarily to lead to the conclusion that the whole risk was intentionally incurred by the plaintiff.

*Dube v. Labar, supra* at 276–77. See *Lehnert v. Stein*, [1963] S.C.R. 38, 40 W.W.R. 616, 36 D.L.R. (2d) 159 [Man.]

Thus, *volenti* will arise only where the circumstances are such that it is clear that the plaintiff, knowing of the virtually certain risk of harm, in essence bargained away his right to sue for injuries incurred as a result of any negligence on the defendant's part. *Id.* The acceptance of risk may be express or may rise by necessary implication from the conduct of the parties, but it will arise, in cases only where there can truly be said to be an understanding on the part of both parties that the defendant assumed no responsibility to take due care for the safety of the plaintiff, and that the plaintiff did not expect him to. *Id.; Eid v. Dumas*, [1969] S.C.R. 668, 5 D.L.R. (3d) 561 (Supreme Court of Canada).

Further quoting:

> ... the key to understanding the true scope of the *volens* maxim lies in drawing a distinction between what may be called physical and legal risk. Physical risk is the risk of damage in fact: legal risk is the risk of damage in fact for which there will be no redress in law. To put this in general terms, the defence of *volens* does not apply where as a result of a mental process the plaintiff decides to take a chance but there is nothing in his conduct to show a waiver of the right of action communicated to the other party. To constitute a defence, there must have been an express or implied bargain between the parties whereby the plaintiff gave up his right of action for negligence.

*Dubar, supra; Eid, supra.*

In such light, this Court finds a genuine issue of material fact exists such that summary judgment is not appropriate on this issue. In addition to those points addressed in the discussion of the "release," this Court is concerned with whether Goldstein was knowledgeable and appreciated the risks associated with whitewater rafting on the Chilko River; whether any discussion occurred by the participants in order for them to appreciate the risks involved in this trip either before they signed the "release" or prior to their rafting trip on Saturday, August 1, 1987; and whether "high siding" was explained? Viewing the record in a light most favorable to the plaintiff, the issue of assumption of the

risk is more appropriately placed before the trier of fact to determine the events that occurred as they pertain to this issue. Accordingly, defendants' Motion for Summary Judgment is DENIED.

## VI. CONCLUSION

In accordance with the foregoing, this Court finds that Defendants' Motion for Summary Judgment and Renewed Motion for Summary Judgment are hereby DENIED and that Ohio law will apply to the issue of the release and British Columbia law to the issue of assumption of risk. This matter is hereby SET FOR TRIAL to begin on Monday, June 17, 1991. The parties shall file a Joint Final Pretrial Order on Friday, May 17, 1991.

IT IS SO ORDERED.