David H. LYLE, Plaintiff,

v.

MERCY HOSPITAL ANDERSON, Defendant.

No. C–1–93–699.

United States District Court, S.D. Ohio, Western Division.

Jan. 27, 1995.

---

**158**

Paul Henry Tobias, Tobias & Kraus, Cincinnati, OH, for plaintiff.

David Thomson Croall, Frost & Jacobs, Cincinnati, OH, for defendant.

### ORDER

HERMAN J. WEBER, District Judge.

Plaintiff David H. Lyle brings this action through counsel under the Employee Polygraph Protection Act of 1988, 29 U.S.C. § 2005(c), and Ohio common law. Defendant Mercy Hospital Anderson is an independent acute care hospital in Cincinnati, Ohio.

This matter is before the Court upon Mercy Hospital's motion for summary judgment (doc. no. 7), plaintiff's memorandum in opposition (doc. no. 10), Mercy Hospital's reply (doc. no. 13), plaintiff's response (doc. no. 15), and the parties' proposed findings of fact and conclusions of law (doc. nos. 18–21). On December 20, 1994, the Court held a hearing during which the parties presented oral arguments.

### I.

Plaintiff began his employment with Mercy Hospital on October 15, 1984. He worked as a surgical assistant for approximately 8 years until his discharge on October 12, 1992.

Over a period of at least several years prior to plaintiff's discharge, surgeons and male surgery personnel at Mercy Hospital reported money being taken from their lockers in the surgery locker room. On January 3, 1990, for example, a physician reported $60 missing from his locker. Hospital employees reported similar incidents of missing money in varying amounts on January 11, 1990, February 23, 1990, January 12, 1992, March 2, 1992, April 28, 1992, and July 1, 1992.

On the morning of October 6, 1992, Dr. Lee, a physician with privileges at Mercy Hospital, reported to hospital security that approximately $200 had been stolen from his locker between 8:00 a.m. and 8:15 a.m.

Mercy Hospital's vice-president of human resources, Jack Finley, initiated an investigation that same afternoon. The investigation began with a general meeting of some of the employees who had ordinary access to the mens' locker room in the surgery area including male surgical technicians, operating room technicians, and one male nurse. Absent from the meeting were physicians, nurse anesthetists, transporters, maintenance personnel, and laundry personnel. Mercy Hospital did not include these employees in its investigation of the theft of Dr. Lee's money.

Plaintiff recalls Finley telling the group that employees may be given a lie detector test "at a later date." (Plaintiff's depos., p. 138).

Those present at the general meeting were individually escorted to the locker room where their lockers and personal effects were searched. During the search the employees were questioned individually concerning their whereabouts during the time of the theft.

When Finley met with plaintiff, he looked through plaintiff's locker and found nothing. According to plaintiff, Finley stated, "Well, Dave, how do you feel about a lie detector or what's your opinion of a lie detector test?" *Id.* at 143–44. Plaintiff responded:

I have a very good friend ... who is a lawyer, and we had a long discussion on this very thing long ago, and he said to avoid them at all costs. He said they're

inadmissible as evidence in court. He said a lot of times they use them as a scare tactic, and he said if you can, avoid it. *Id.* at 144. Plaintiff was the only individual who expressed an unwillingness to take a lie detector test. A written summary of the locker room search states that plaintiff 'objected to polygraph.' (doc no. 19, p. 4).

On October 12, 1992, Finley met with plaintiff for the second time and again asked him where he was during the time of the theft. Plaintiff allegedly responded that he was not sure and did not know.

Plaintiff alleges that Finley stated, "Well, Dave we're going to make you the scapegoat. You were in the wrong place at the wrong time, and if it doesn't stop with you being fired, I'm going to fire the next guy and the next guy and the next guy and the next guy until it stops." (plaintiff's depos., p. 164). Finley then asked plaintiff to resign and when plaintiff refused, Finley discharged him.

Finley denies telling plaintiff he was the scapegoat. Finley explains his decision to discharge plaintiff on the grounds that he had a strong suspicion that plaintiff committed the October 6, 1992 theft. He reached this conclusion because plaintiff's account of his whereabouts seemed evasive and insufficient, and because plaintiff had access to the stolen property, had an opportunity to commit the theft, admitted that he had been in the locker room at or around the time of the theft, had been suspected of committing a prior locker room theft, and had an admitted history of dishonesty.

Plaintiff has always maintained his innocence of the October 6, 1992 theft.

Finley informed Sister Suzanne Brennan in a memorandum that plaintiff had been discharged in connection with the theft. Finley reported in the memorandum that plaintiff did not express interest in taking a lie detector test, whereas others were willing to take the test.

After his termination, plaintiff spoke with Dr. Rugh to see if Dr. Rugh could help him. Dr. Rugh spoke with Finley. Finley gave Dr. Rugh the impression that things could be patched up if plaintiff took a lie detector test.

## II.

Plaintiff claims that Mercy Hospital violated the Employee Polygraph Protection Act (EPPA) by asking him about his willingness to submit to a lie detector test and by discharging him because of his refusal to submit to the test.

Mercy Hospital contends that it is entitled to summary judgment in its favor because plaintiff has not produced evidence tending to support each element of a claim under the EPPA. Mercy Hospital further contends that it qualifies for the EPPA's ongoing investigation exemption.

The legal standard for consideration and disposition of issues on summary judgment is well settled and is set forth in *Goldstein v. D.D.B. Needham,* 740 F.Supp. 461, 463 (S.D.Ohio 1990).

It is unlawful under the EPPA for private employers "directly or indirectly, to require, request, suggest, or cause any employee ... to take or submit to any lie detector test ..." 29 U.S.C. § 2002(1). It is also unlawful under the EPPA for an employer to "discharge, discipline, discriminate against in any manner, or deny employment or promotion to, or threaten to take any such action against ..." an employee who refuses to take a lie detector test. 29 U.S.C. § 2002(3).

An employer is liable for violating the EPPA in a private civil action to the employee effected by the violation "for such legal or equitable relief as may be appropriate, including, but not limited to, employment, reinstatement, promotion, and the payment of lost wages and benefits." 29 U.S.C. § 2005(c).

### A.

■ Mercy Hospital argues that plaintiff has failed to establish a prima facie case under the EPPA because it did not "require, request, subject or cause" plaintiff "to take or submit to" a lie detector test (doc. no. 7. p. 9). Mercy Hospital contends, "Finley merely asked [plaintiff], as he asked every other employee at the general investigatory meeting, whether [plaintiff] would be willing to

take a test if one were offered ... Finley later determined not to include a polygraph as part of the investigation and, therefore, a lie detector test was never offered and no action was taken based on any individual's opinion about a lie detector test." *Id.*

The Court finds Mercy Hospital's contentions meritless. A reasonable juror viewing plaintiff's version of the events and the record as a whole could reasonably conclude that Finley directly or indirectly suggested to plaintiff that he needed to take a lie detector test or that Finley based his decision to discharge plaintiff on his unwillingness to submit to a lie detector test. The following evidence taken as a whole supports the reasonableness of these inferences: Finley's alleged statement to the surgical assistants at the general meeting of October 6, 1992 regarding the possible administration of the lie detector test "at a later date" when combined with Finley's alleged question to plaintiff regarding his opinion of the lie detector test while plaintiff's locker was being searched for evidence of the theft; a written summary of the locker room search states that plaintiff "objected to polygraph" (doc. no. 19, p. 4); Finley reported in his memorandum to Sister Brennan that plaintiff did not express interest in taking a lie detector test, whereas others were willing to take the test; and Finley gave Dr. Rugh the impression that things could be patched up if plaintiff took a lie detector test. *Id.* at 7.

Accordingly, Mercy Hospital's contentions regarding plaintiff's inability to demonstrate a prima facie case under the EPPA lack merit.

### B.

Mercy Hospital contends that it qualifies for the ongoing investigation exemption to the EPPA and, consequently, could have required plaintiff to take a lie detector test because it was investigating an "economic loss", plaintiff had access to the stolen property, and Mercy Hospital possessed a reasonable suspicion that plaintiff was involved in the theft.

Plaintiff argues that Mercy Hospital does not qualify for the ongoing investigation ex-

emption because it cannot demonstrate that it suffered an "economic loss" from the theft.

The EPPA provides numerous exemptions for certain employers. *See* 29 U.S.C. § 2006. The ongoing investigation exemption states the following:

[T]his Act shall not prohibit an employer from requesting an employee to submit to a polygraph test if—

(1) the test is administered in connection with an ongoing investigation involving economic loss or injury to the employer's business, such as theft, embezzlement, misappropriation ...,

(2) the employee had access to the property that is the subject of the investigation;

(3) the employer has a reasonable suspicion that the employee was involved in the incident or activity under investigation; and

(4) the employer executes a statement, provided to the examinee before the test, that—

(A) sets forth with particularity the specific incident or activity being investigated and the basis for testing particular employees,

(B) is signed by a person (other than a polygraph examiner) authorized to legally bind the employer,

(C) is retained by the employer for at least 3 years, and

(D) contains at a minimum—(i) an identification of the specific economic loss or injury to the business of the employer, (ii) a statement indicating that the employee had access to the property that is the subject of the investigation, and (iii) a statement describing the basis of the employer's reasonable suspicion that the employee was involved in the incident or activity under investigation.

29 U.S.C. § 2006(d).

Congress further restricted the use of the ongoing investigation exemption as follows:

Except as provided in paragraph (2), the exemption in ... [§ 2006(d) ] shall not apply if an employee is discharged, disci-

plined, denied employment or promotion, or otherwise discriminated against in any manner on the basis of the analysis of a polygraph test chart or the refusal to take a polygraph test, without additional supporting evidence. The evidence required by such subsection [§ 2006(d) ] may serve as additional supporting evidence.

29 U.S.C. § 2007(a). Section 2007(b) specifies an examinee's pre-testing rights and rights during all phases of the investigation process.

■ The Court finds that Mercy Hospital does not qualify for the ongoing investigation exemption in this case because it cannot demonstrate it suffered an economic loss to its business due to the theft from Dr. Lee on October 6, 1992. As the Department of Labor Regulations clarify:

It is the business of the employer which must suffer the economic loss or injury. Thus, a theft committed by one employee against another employee of the same employer would not satisfy the requirement.

29 C.F.R. § 801.12(c)(3) (emphasis added). Here, Mercy Hospital has made no showing that its business of patient care was affected, directly or indirectly, by the theft from Dr. Lee. It has therefore failed to establish an essential element of the ongoing investigation exemption. *See* 29 U.S.C. § 2006(d)(1).

Mercy Hospital argues that the following regulation is analogous to the instant case:

Indirect loss or injury also includes theft or injury to property of another for which the employer exercises fiduciary, managerial or security responsibility ... For example, if a maintenance employee of the manager of an apartment building steals jewelry from a tenant's apartment, the theft results in an indirect economic loss or injury to the employer because of the manager's management responsibility with respect to the tenant's apartment.

29 C.F.R. § 801.12(c)(1)(iv). Mercy Hospital contends that "[s]ince no employer-employee relationship exists between the doctor and the hospital, the analysis should focus on the hospital's role as manager of the institution, with a duty to provide an environment free of

theft." (doc. no. 13, p. 8). "Just as the theft by the maintenance employee ... results in an indirect loss to the apartment manager, the theft by the hospital employee from the doctor results in an indirect loss to the hospital." *Id.*

These contentions focus too much on Mercy Hospital's role as manager of the institution and too little on its main business, providing patient care. Arguably, the theft from the doctor was unrelated to the hospital's main business of patient care, and therefore Mercy Hospital suffered no indirect loss to its business of providing patient care. The apartment manager's business is essentially accepting money (lease payments) in exchange for providing tenants with a safe and secure place to live. This business suffers a loss when a maintenance employee steals from a tenant. Mercy Hospital, in contrast, has not demonstrated under the rules applied on summary judgment how its main business of patient care suffered a loss because of the theft on October 6, 1992. Consequently, Mercy Hospital's analogy fails.

Mercy Hospital's reliance on the ongoing investigation exemption also fails because Mercy Hospital did not provide plaintiff with the procedural safeguards mandated by the exemption, such as a statement containing "with particularity the specific incident or activity being investigated and the basis for testing ..." [1] plaintiff. The regulations clarify that the ongoing investigation exemption "sets forth what information, at a minimum, must be provided to an employee if the employer wishes to claim the exemption." 29 C.F.R. § 801.12(g)(1). Since Mercy Hospital wishes to claim the exemption, it must demonstrate that it provided the required information in order to qualify for the exemption. It has not; it therefore cannot find safe haven in the ongoing investigation exemption.

This reasoning is valid even though Mercy Hospital never administered a lie detector test to plaintiff because a genuine dispute exists in the record on whether Mercy Hospital directly or indirectly requested or suggested to plaintiff that he submit to a lie

[1] 29 U.S.C. § 2006(d)(4)(A).

detector test, and whether Mercy Hospital discharged plaintiff for refusing to take a lie detector test. Assuming, as this Court must at the summary judgment stage, that Mercy Hospital violated the EPPA, *see supra*, pp. 159–160, Mercy Hospital may only claim the ongoing investigation exemption by demonstrating that it meets all the elements of the exemption, including the procedural elements listed in § 2006(d)(4). Mercy Hospital's failure to do so is fatal to its claimed exemption.

Accordingly, for all of the above reasons, Mercy Hospital is not entitled to summary judgment in its favor on plaintiff's EPPA claim.

### III.

Mercy Hospital contends that it is entitled to summary judgment on plaintiff's Ohio common law claims. The Court finds that genuine disputes exist in the record on the issues raised by plaintiff's Ohio common law claims. Mercy Hospital's motion for summary judgment is, therefore, not well taken. *See Goldstein*, 740 F.Supp. at 463.

### ORDER

The Court hereby **ORDERS** that defendant Mercy Hospital's motion for summary judgment (doc. no. 7) is **DENIED**. The previously scheduled trial date of Monday, February 20, 1995, is **CONTINUED** until **Tuesday, February 21, 1995, at 1:30 p.m.**

**IT IS SO ORDERED.**