Janet L. LONG, Plaintiff,

v.

MANGO'S TROPICAL CAFE,
INC., Defendant.

No. 96–2098–CIV.

United States District Court,
S.D. Florida.

March 13, 1997.

Andres Rivera-Ortiz, Miami, FL, for Plaintiff.

Robert Frankel, Miami, FL, for Defendant.

### ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING PLAINTIFF'S MOTION TO AMEND COMPLAINT; DENYING DEFENDANT'S MOTION FOR RULE 11 SANCTIONS; DENYING PLAINTIFF'S MOTION FOR RULE 11 SANCTIONS

JAMES LAWRENCE KING, District Judge.

THIS CAUSE, arising out of a lawsuit alleging violations of the Employee Polygraph Protection Act of 1988, 29 U.S.C. §§ 2001–2009, presents several issues of first impression in the Eleventh Circuit and, in many respects, the country.

The case comes before the Court upon a Motion For Summary Judgment, filed by Defendant, Mango's Tropical Cafe, Inc. ("Mango's"), on January 15, 1997. (D.E.# 8.) Plaintiff, Janet L. Long, filed a Response in opposition on January 22, 1997. (D.E.# 17.) Defendant filed a Reply on January 31, 1997. (D.E.# 24.)[1]

Plaintiff filed a Cross–Motion For Partial Summary Judgment on January, 22, 1997. (D.E.# 17.) Defendant filed a Response in opposition on January 31, 1997. (D.E.# 24.) Plaintiff filed a Reply on February 10, 1997. (D.E.# 29.)[2]

Plaintiff filed a Motion To Amend Complaint on January 15, 1997. (D.E.# 15.) Defendant filed a Response in opposition on January 27, 1997. (D.E.# 23.) Plaintiff filed a Reply on February 3, 1997. (D.E.# 27.)[3]

Defendant filed a Motion For Rule 11 Sanctions on January 15, 1997. (D.E.# 13.) Plaintiff filed a Response in opposition on January 22, 1997. (D.E.# 19.)

Finally, Plaintiff filed a Motion For Rule 11 Sanctions, on February 3, 1997. (D.E.# 26.) Defendant filed Response in opposition on February 10, 1997. (D.E.# 30.)

### I. FACTUAL BACKGROUND

The following facts are both relevant to the instant Motions and uncontroverted. Defendant, a bar on South Beach in Miami Beach, hired a company, Deception Control, Inc., to send undercover agents, called spotters, into Defendant's bar to observe the bartenders and report on the their conduct. On the night of June 10, 1996, the spotters conducted a surveillance and recorded their observations in a report[4], (see Wallack Aff. Ex. A) (D.E.# 10), that included the following:

---

1. In support of its Motion, Defendant filed three documents on January 15, 1997: a Concise Statement Of Uncontested Facts, (D.E.# 14); an Affidavit Of David Wallack, (D.E.# 10); and an Affidavit Of Al Gonzalez, (D.E.# 11). Defendant also filed a Deposition Of Janet L. Long and Exhibits on January 21, 1997. (D.E.# 16.) In opposition, Plaintiff filed a Statement of Disputed Facts on January 22, 1997. (D.E.# 20.)

2. In support of her Motion, as well as in opposition to Defendant's Motion For Summary Judgment, Plaintiff filed three documents on January 22, 1997: a Statement Of Undisputed Facts,

(D.E.# 22), and an Affidavit Of Janet L. Long and Deposition Of Janet L. Long, (both D.E. # 21).

3. In support of her Motion, Plaintiff filed an Affidavit of Sheryl Bouchard. (D.E.# 28).

4. The Report, on letterhead of Deception Control, Inc., contains observations about Plaintiff as well as three other bartenders working on the same shift on June 10, 1996. The observations about the other bartenders are not relevant to the instant Motions.

The barmaid who identified herself as "KILLER"[5] was observed as she took multiple drink orders from several patrons without recording [sic] immediately after each service. On one occasion she was observed taking a $20 bill from a patron, folded the bill and placed it inside the band of her shorts. Immediately after, she took a drink order from another patron, prepared the drinks and took the money from this patron as well.

As she walked to the northern register, she retrieved the $20 bill from her shorts band and rang up only one sale. The money from the second patron was thrown into the tip jar. . . .

At 11:50 p.m. when the agent ordered a second round of drinks, Killer prepared the drinks, placed them in front of the agents and retrieved a $20 bill from the agent. She made changed [sic] the $20 in the register, placed most of the money into her tip jar, and placed agents' change ($8.50) on the bar. Killer had not recorded this sale and the register window read "No Sale".

It is strongly believed that Killer was "high". She was observed on many occasions as she "wiped" her nose, kept licking her lips and wiping the corners of her mouth.

(*Id.* Ex. A at 2–3.)

Based on that report, Defendant suspended Plaintiff from work and requested that she submit to a polygraph examination. Plaintiff took the polygraph examination in late June 1996.

## II. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is appropriate only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court must view the evidence in the light most favorable to the nonmoving party. *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. If the movant meets this burden, the burden then shifts to the nonmoving party to establish that a genuine dispute of material fact exits. *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 918 (11th Cir.1993). If the evidence relied on is such that a reasonable jury could return a verdict in favor of the nonmoving party, then the Court should refuse to grant summary judgment. *Hairston,* 9 F.3d at 919. However, a mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. If the evidence is merely colorable or is not significantly probative, summary judgment is proper. *Id.* at 249–50, 106 S.Ct. at 2510–11.

## III. DISCUSSION—DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. The Employee Polygraph Protection Act of 1988

Plaintiff's Complaint alleges that Defendant violated the Employee Polygraph Protection Act of 1988, 29 U.S.C. §§ 2001–2009. As the court in *Mennen v. Easter Stores,* 951 F.Supp. 838, 848 (N.D.Iowa 1997), states:

Although Congress passed the EPPA eight years ago, a court applying the Act still finds itself in relatively uncharted territory, as case law applying the EPPA is sparse. Such case law as the court has found is of little help, because there are but few federal cases even mentioning the EPPA, and only a handful of these actually address claims made pursuant to the Act. . . . Thus, for guidance on the context in which the EPPA was born and such clues on application of the Act as that context may provide, the court turns to the legislative history of the EPPA, as well as to legal commentary on its genesis and effect on the workplace.

The *Mennen* court then goes on to thoroughly and ably discuss the legislative history and

5. "Killer" is Plaintiff's nickname. (Long Dep. at 15) (D.E.# 16.)

the legal commentary, an exercise this Court need not repeat.[6] Undoubtedly, the EPPA stands as a watershed in "the ongoing and apparently ceaseless conflict between the employee's right to privacy and the employer's right to protect its business." *Mennen,* 951 F.Supp. at 849.

In the instant case, Plaintiff alleges numerous violations, including violations of various provisions of §§ 2002, 2006 and 2007. Section 2002 states in pertinent part:

Except as provided in sections 2006 and 2007 of this title, it shall be unlawful for any employer engaged in or affecting commerce . . .

(1) directly or indirectly, to require, *request,* suggest or cause any employee . . . to take or submit to any lie detector test; . . .

(3) to discharge, discipline, discriminate against in any manner, or deny employment or promotion to, or *threaten* to take any such action against—

(A) any employee or prospective employee who refuses, declines, or fails to take or submit to any lie detector test. . . .

29 U.S.C.A. § 2002(1) & (3) (Supp.1996).

Section 2006(d) states in pertinent part:

Subject to sections 2007 and 2009 of this title, this chapter shall not prohibit an employer from requesting an employee to submit to a polygraph test if—

(1) the test is administered in connection with an *ongoing investigation* involving economic loss or injury to the employer's business, such as theft . . .;

(2) the employee had *access* to the property that is the subject of the investigation;

(3) the employer has a *reasonable suspicion* that the employee was involved in

the incident or activity under investigation;

(4) and the employer executes a statement, provided to the examiner before the test that—

(A) sets forth with particularity the *specific incident or activity* being investigated and the basis for testing particular employees,

(B) is signed by a person (other than a polygraph examiner) authorized to legally bind the employer,

(C) is retained by the employer for at least 3 years, and

(D) contains at a minimum—

(i) an identification of the *specific economic loss* or injury to the business of the employer,

(ii) a statement indicating that the employee had *access* to the property that is the subject of the investigation, and

(iii) a statement describing the basis of the employer's *reasonable suspicion* that the employee was involved in the incident or activity under investigation.

*Id.* § 2006(d) (Supp.1996) (emphases added).

Section 2007(b)(2) and (b)(4) state in pertinent part:

The exemptions provided under subsection[ ](d) . . . of section 2006 of this title shall not apply unless the requirements described in the following paragraphs are met: . . .

(2) Pretest phase

During the pretest phase, the prospective examinee—

(A) is provided with *reasonable written notice* of the date, time, and location of the test, and of such examinee's *right to obtain and consult with legal counsel* or an employee repre-

---

**6.** Let it suffice to summarize one of Congress' key findings:

The Committee [on Labor and Human Resources] also found that many employers and polygraph examiners abuse and manipulate the testing process and frequently use inaccurate or unfounded results to justify employment decisions which otherwise would be suspect. While this abuse is not true of all employers or examiners, it is sufficiently

widespread to warrant congressional action. Employees and applicants are being unjustly terminated or denied employment not due to their own shortcomings but due to the intentional and unintentional misuse of the polygraph exam and due to the inherent inaccuracies of the most common testing processes. S. Rep. No. 100–284, at 46 (1988), *reprinted in* 1988 U.S.C.C.A.N. 726, 734.

sentative before each phase of the test; ...

*Id.* § 2007(b)(2) (Supp.1996) (emphases added).

### B. "Reasonable Suspicion"— The Evidence

■ Defendant asserts in its Motion For Summary Judgment that there exist no disputes over genuine issues of material fact with regard to each of Plaintiff's allegations. Plaintiff disagrees and points to several disputed issues, including the issue that the Court finds forms the crux of Defendant's Motion. That issue is whether Defendant had "reasonable suspicion" to request that Plaintiff submit to a polygraph examination.[7]

The EPPA does not define "reasonable suspicion."[8] The interpretive regulations promulgated by the Department of Labor, however, state:

[T]he term "reasonable suspicion" refers to an observable, articulable basis in fact which indicates that a particular employee was involved in, or responsible for, an economic loss.... Information from a co-worker, or an employee's behavior, demeanor, or conduct may be factors in the basis for reasonable suspicion. Likewise inconsistencies between facts, claims, or statements that surface during an investigation can serve as a sufficient basis for reasonable suspicion. While access or opportunity, standing alone, does not constitute a basis for reasonable suspicion, the totality of the circumstances surrounding the access or opportunity (such as its un-

authorized or unusual nature or the fact that access was limited to a single individual) may constitute a factor in determining whether there is a reasonable suspicion.

29 C.F.R. § 801.12(f)(1) (1996).

■ Many of Defendant's assertions, including the assertion that it had reasonable suspicion, rely heavily on documents signed by Plaintiff before, during, or after the polygraph examination.[9] Among the documents signed was a "Release To Take Polygraph Test," which states,

I FURTHER AGREE THAT THE COM-PANY HAS REASONABLE SUSPICION TO REQUEST THAT I SUBMIT TO A POLYGRAPH EXAMINATION AND I'M COMPLETELY SATISFIED WITH THE EXPLANATION GIVEN TO ME IN WRITING IN THE "48 HOURS TO TAKE A POLYGRAPH TEST" FORM · BY THE COMPANY.

(Def.'s Notice of Filing Dep. and Exs. Ex. 3 at 4) (D.E.# 16.)

Does Plaintiff's signature serve to dispose of the reasonable suspicion issue? The Court finds it does not. The anti-waiver provision of 29 U.S.C. § 2005(d) states, "The rights and procedures provided by this chapter may not be waived by contract or otherwise, unless such waiver is part of a written settlement agreed to and signed by the parties to the pending action or complaint under this chapter." 29 U.S.C. § 2005(d) (Supp. 1996). Because no written settlement exists between the parties, Plaintiff cannot have

---

7. *In order to overcome the EPPA's broad proscription against the private employer's use of polygraph tests, see* § 2002 quoted *supra,* at part III.A, Defendant invokes the "ongoing investigation" exemption found in § 2006(d), *see* § 2006(d) quoted *supra,* at part III.A. Of the interaction of the two sections, the *Mennen* court states:

Although section 2002 serves to virtually eradicate polygraph use in the private employment sector, Congress created a limited exemption for an ongoing investigation of an employee's theft.... The legislative history of the EPPA, however, clearly reflects the legislative intent that this exemption be narrowly construed and subject to careful restrictions and conditions.

*Mennen,* 951 F.Supp. at 851.

8. One commentator christened the "reasonable suspicion" question as possibly "the most com-

plex issue posed by, and ultimately litigated under, the Act." Robert B. Fitzpatrick, *The Employee Polygraph Protection Act of 1988,* 35 Fed. Bar News & J. 369, 370 (1988).

9. The documents are the: 1) so-called, but untitled, "48–Hour Notice," dated June 21, 1996; 2) Release To Take Polygraph Test and Post Test Release And Waiver, dated June 27, 1996; 3) Specific Test, dated June 27, 1996; 4) Notice To Examinee, dated June 26 & 27, 1996; 5) Examine [sic] Check Off List, dated June 26 & 27, 1996; and 5) Chart of Polygraph Examination. (Def.'s Notice of Filing Dep. and Exs. Exs. 2–4) (D.E.# 16.) For the sake of convenience, the Court hereinafter refers to these documents collectively as the "Polygraph Documents."

waived any rights or procedures to which she is entitled under the EPPA.[10] Thus the Court, without finding what weight, if any, to allot to the Polygraph Documents, finds that Plaintiff's signing of the Release does not, in and of itself, confer on Defendant the reasonable suspicion necessary to request that Plaintiff take a polygraph.[11]

Just because the EPPA forecloses Defendant from proving it had reasonable suspicion based on the Polygraph Documents does not mean it cannot prove reasonable suspicion as a matter of law. But stripped of any dispositive effect that might be afforded by the Polygraph Documents, Defendant's Motion rests on two legs: Plaintiff's actions as recorded in the Spotter's Report, *see supra*, at part I; and the contention that Plaintiff's statements contradicting Defendant's position should be barred altogether.

As to the second leg, Defendant relies on the sensible proposition that "a party may not create a material issue of fact by submitting an affidavit which disputes his or her own prior sworn testimony." [12] (Def.'s Mot. for Summ. J. at 10) (D.E.# 8.) That said,

Defendant abruptly reverts to building its case primarily on the same Polygraph Documents that the Court found nondispositive *supra*.[13] Worse for Defendant, the Polygraph Documents, not being sworn, do not fit into the category of documents that render null a later-submitted affidavit (or other sworn testimony). Thus, the Court finds no reason not to consider Plaintiff's sworn testimony.[14]

On that basis, then, the Court reviews Plaintiff's evidence in opposition to Defendant's Motion For Summary Judgment. Plaintiff, without explicitly admitting to have taken those actions on the night of June 10, states that she and other bartenders routinely took such actions and that Defendant knew they did and condoned their doing so. For example, Defendant required female bartenders to wear "short, tight, and sexy" outfits, and Plaintiff's shorts had no pockets. (Long Aff. ¶ 3.) Defendant permitted Plaintiff to take orders, and payments, from more than one bar patron before ringing up each sale in the cash register. (*Id.*) She states: "When I did so, I placed the orders, and

**10.** Support for the Court's straightforward interpretation comes from *Saari v. Smith Barney, Harris Upham & Co.*, 968 F.2d 877 (9th Cir.), *cert. denied*, 506 U.S. 986, 113 S.Ct. 494, 121 L.Ed.2d 432 (1992), which states:

In order for an employer to avail itself of the provisions relating to ongoing investigations in Section 2006(d), it would be required to follow certain "procedures." It is the type of procedure found in 2006(d) that an employer may attempt to have a prospective employee waive as a condition of employment, and that the anti-waiver provision would invalidate if extracted from the employee.

*Id.* at 881–82 (footnote omitted). Although the above-quoted material deals with an employer's treatment of a prospective employee, this Court finds nothing in the EPPA that would diminish the rights of an already-hired employee, as is involved in the instant case.

Further support comes from *Blackwell v. 53rd-Ellis Currency Exchange*, 852 F.Supp. 646 (N.D.Ill.), *vacated without explanation*, 873 F.Supp. 103 (N.D.Ill.1994), which states:

[W]e reject Defendant's argument that Plaintiff's appearance and voluntary participation in the polygraph examination indicates a waiver of any of her rights under the EPPA. Section 2005(d) unequivocally states that the rights and procedures under the EPPA "may not be waived by contract or otherwise, unless such waiver is part of a settlement agreed to and signed by the parties to the pending action or

complaint under this chapter." 29 U.S.C. § 2005(d). It would thus seem that even an employee who wanted to take a polygraph test in order to exonerate herself would not be able to waive the Act's requirements.

*Id.* at 651 n. 7.

**11.** The Court notes that nowhere in the Motions or other papers does Defendant address the effect of § 2005(d).

**12.** Defendant cites to the Second Circuit case of *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir.1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony.")

**13.** For example, Defendant refers to Plaintiff's having signed the "48–Hour Notice," (Def.'s Mot. for Summ. J. at 10–11) (D.E.# 8), and the Notice To Examinee, (*id.* at 12).

**14.** To the extent that Defendant builds its case for summary judgment on the purported contradictions between Plaintiff's sworn testimony, (see Def.'s Notice of Filing Dep. and Exs., Long Dep.) (D.E.# 16), and the Polygraph Documents, the Court considers that evidence on equal footing with Plaintiff's evidence.

moneys [sic] received from patrons[ ] in the band of my shorts because the shorts had no pockets.... Mango allowed us to take multiple orders from patrons and to ring them in the cash register when we had a chance." (*Id.*)

She also asserts that Defendant permitted bartenders to ring up a "No Sale" in the register. The ringing of "No Sales" occurred under two circumstances. First, if a bartender, in ringing up a sale, incorrectly overcharged a customer, say, by $4, the bartender, rather than voiding the amount of the overcharge (a procedure that required a manager's intervention with a computer card), could wait until she sold a $4 drink, and then ring up a "No Sale" and place the $4 into the register. She states, "Mango's knew this was done by the bartenders and allowed it." (*Id.* ¶ 4.) Second, if a bartender were asked to make change, the bartender would ring up a "No Sale," and then place, say, a $5 bill into the register and withdraw five $1 bills to give to the customer. (*See* ¶ 5.)

Defendant also permitted bartenders to use a tip jar, into which tips were deposited before being divvied up at the end of a shift. (*Id.* ¶ 5.) She states:

> [A] patron may give a bartender a $1.00 tip, but hand over a $5.00 [sic] to be changed. In that situation, Mango's allowed the bartender to open the register to change the $5.00 by ringing a no sale. The bartender would change the $5.00, place the $1.00 tip in the tip jar, and return the $4.00 change to the customer.... Although it may seem to a spotter in that situation that the bartender is stealing from the cash register, that is not so.

(*Id.* ¶ 6.)

As to the allegation that Plaintiff looked "high" based on her wiping her nose and the corners of her mouth, and licking her lips,[15] Plaintiff states that Defendant required her to wear heavy makeup, that the bar did not have air conditioning, and that she was sweating heavily. (Long Aff. ¶ 3.) (D.E.# 21.) She also asserts that she was getting over a cold. (*Id.* ¶ 8.)

## C. "Reasonable Suspicion"— The Conclusion

Plaintiff's assertions regarding Defendant's condoning the ringing up of "No Sales" and the use of the tip jar go uncontested. Such conduct in the bar business being plausible, the Court accepts Plaintiff's assertions as true. More problematic is Plaintiff's admission that her actions as recorded in the Spotter's Report "might appear that way," (Def.'s Notice of Filing Dep. and Exs., Long Dep. at 23 11.11–12) (D.E.# 16), meaning that her actions might appear as if she were stealing. Defendant argues that Plaintiff thus effectively concedes that reasonable suspicion existed. The context of Plaintiff's statement, however, militates against such a finding. Although the Court agrees that Plaintiff's actions may have looked like stealing to a spotter (in fact, they did look like stealing to the spotter whom Defendant hired), the analysis does not end there. For it is not the spotter who must have reasonable suspicion of illegal activity, but rather the employer-Defendant. Here, Defendant presents no evidence that the spotter knew about the rules and procedures—specifically those regarding the ringing up of "No Sales" and the use of the tip jar—under which Plaintiff and the other bartenders worked. Plaintiff, on the other hand, presents evidence in the form of her own sworn testimony that Defendant knew of and condoned the ringing up of "No Sales" and the use of the tip jar. Thus, Defendant fails to distinguish between unauthorized and authorized conduct, which is to say, fails to present evidence regarding how Plaintiff's actions on June 10, 1996, constituted stealing rather than the following of a standard operating procedure that Defendant apparently knew its bartenders followed.

The example given in the Regulations helps clarify the foregoing point:

> [I]n an investigation of a theft of an expensive piece of jewelry, an employee authorized to open the establishment's safe no earlier than 9 a.m., in order to place the jewelry in a window display case, is ob-

---

15. Such an observation constitutes the kind of "behavior, demeanor, or conduct" evidence con-

templated in the Regulations. *See* § 801.12(f)(1) (1996), quoted in context *supra,* at part III.B.

served opening the safe at 7:30 a.m. In such a situation, the opening of the safe by the employee one and one-half hours prior to the specified time may serve as the basis for reasonable suspicion. On the other hand, in the example given, if the employer asked the employee to bring the piece of jewelry to his or her office at 7:30 a.m., and the employee then opened the safe and reported the jewelry missing, such access, standing alone, would not constitute a basis for reasonable suspicion that the employee was involved in the incident unless access to the safe was limited solely to the employee.

29 C.F.R. § 801.12(f)(2) (1996). Although the example does not precisely mirror the situation in the instant case, it provides strong guidance. Whereas the first sentence, viewed alone, suggests reasonable suspicion, that conclusion evaporates upon reading the third sentence, which puts the employee's actions in context. In the instant case, Plaintiff's actions, viewed alone from the spotter's perspective, probably constitute reasonable suspicion to believe she was involved in an economic loss. But when the Court views her actions within "the totality of the circumstances," 29 C.F.R. § 801.12(f)(1) (1996), i.e., in the context of the kind of conduct that Defendant permitted its bartenders to engage in [16], the Court sees a genuine dispute over a material fact.

In conclusion, the Court finds that there exists a dispute over a genuine issue of material fact, namely whether Defendant had reasonable suspicion, or, conversely, whether Plaintiff's actions were innocuous. Ultimately, that decision will require a jury to weigh the evidence in light of the credibility of the parties, a function reserved for the trier of fact.[17] The evidence, viewed in the light most favorable to Plaintiff, is such that a

reasonable jury would not necessarily return a verdict in favor of Defendant.

### D. Additional Ground For Denying Defendant's Motion

The Court also finds a dispute over a genuine issue of material fact in Plaintiff's contention that Defendant threatened to fire her unless she took a polygraph exam. The record on this issue consists of three pieces of evidence. First, Plaintiff states that on June 17, 1996, "I was told that I had to take [a polygraph exam] if I wanted to keep my job," (Def.'s Notice of Filing Dep. and Exs., Long Dep., at 23 11.2–4 & 20–21) (D.E.# 16). She identifies a manager, Susan Eidelman, as the person who said that to her. (*Id.*, Long Dep., at 22–23.) Second, Plaintiff signed a "Release To Take Polygraph Test," dated June 27, 1996, that states "I FURTHER UNDERSTAND THAT I'M NOT TAKING THIS TEST AS A CONDITION OF EMPLOYMENT, AND THAT I WAS ADVISED THAT I COULD NOT BE FORCED TO TAKE THE TEST BY ANYONE." (*Id.*, Ex. 3 at 4.) And third, the Affidavit of David Wallack, Defendant's owner, who states: "After I personally reviewed the spotter's report, I instructed one of my assistants to contact Janet Long to advise her of the spotter's report. . . . At no time did we ever condition her employment on taking the polygraph examination." (Wallack Aff. ¶ 6) (D.E.# 10.)

As the Court stated *supra,* at part III.C, the weighing of evidence is a function reserved for the jury. Plaintiff essentially states that Defendant violated § 2002(3)(A) when its manager, Ms. Eidelman, threatened to fire her if she refused to take a polygraph. Defendant, through the "Release" document and its owner's affidavit (though without sworn testimony from the manager, Ms. Eidelman), denies Plaintiff's version. Those

---

**16.** To reiterate, Plaintiff's assertions about the conduct Defendant permits its bartenders—particularly the ringing up of "No Sales" and the use of the tip jar—go unchallenged in the record.

**17.** *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not

those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); *Mize v. Jefferson City Board of Education,* 93 F.3d 739 (11th Cir.1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment.").

conflicting accounts constitute a genuine dispute over an issue of material fact.

## IV. DISCUSSION—PLAINTIFF'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT[18]

Plaintiff seeks summary judgment on four issues, only one of which has any merit, although it, too, fails. The first two involve Defendant's alleged violation of § 2007(b)(2)(A), which states:

(2) Pretest phase

During the pretest phase, the prospective examinee—

(A) is provided with reasonable written notice of the date, time, and location of the test, and of such examinee's right to obtain and consult with legal counsel or an employee representative before each phase of the test.

29 U.S.C. § 2007(b)(2)(A) (Supp.1996). Plaintiff argues that Defendant failed to give written notice of the date and time of the test in such a way as to comport with the requirements of 29 C.F.R. 801.23(a)(1) (1996), which states: "During the pretest phase, the examinee must be: (1) Provided with written notice.... Such notice shall be received by the examinee at least forty-eight hours, excluding weekend days and holidays, before the time of the examination...." On June 21, 1996, Plaintiff received and signed the so-called (but untitled) "48–Hour Notice." It states: "You are requested to appear for a polygraph examination at the offices of Mango's Tropical Cafe, Inc., Miami, Florida on June —— 1996, at ——[illegible]m. This notice is to be given to you 48 hours prior to the test date." (Def.'s Notice of Filing Dep. and Exs., Ex. 2) (D.E.# 16.) Plaintiff took the polygraph at least five days later,[19] beyond the forty-eight-hour buffer period. She contends, however, that because the spaces for date and time were left blank, and because she was told orally of the date and time of the test, rather than in writing, that Defendant violated § 2007(b)(2)(A).

The Court finds that Plaintiff had reasonable written notice. Soon after receiving and signing the "48–Hour Notice," she traveled to North Carolina to visit family, (Def.'s Notice of Filing Dep. and Exs., Long Dep. at 39) (D.E.# 16), and "was unable to give [Defendant] a date as to when she would be available for the examination," (Wallack Aff. ¶ 7) (D.E.# 10.) When she returned on either the 26th or 27th, she called Defendant and asked to take the test that day. (Def.'s Notice of Filing Dep. and Exs., Long Dep. at 43 1.20) (D.E.# 16.) The test was scheduled for, and she took the test, the following day. (Id., Long Dep. at 44 11.3–4.)

Section 801.23(a)(1) states, "The purpose of this [48–hour–notice] requirement is to *provide a sufficient opportunity prior to the examination for the examinee to consult with counsel or an employee representative.*" That purpose was served by giving Plaintiff the "48–Hour Notice," Defendant's apparent accommodation of Plaintiff's travel schedule, and Plaintiff's request to take the test.

Plaintiff also contends that Defendant violated § 2007(b)(2)(A) when it informed Plaintiff that she had "the right to consult with legal counsel or a *company representative* before the polygraph examination." (Id., Ex. 2.) (emphasis added.) The section states that the employer must inform the employee of

---

**18.** If the Court were to grant even one part of Plaintiff's Motion, Plaintiff would be entitled to summary judgment as to Defendant's liability. That is because Plaintiff's Motion seeks to have the Court rule that, as a matter of law, Defendant failed to follow certain procedures required by the EPPA. The consequence of such a failure would be fatal to Defendant. Under the EPPA, an employer who requests that an employee take a polygraph essentially subjects itself to a high-wire walk with no net below. In order to invoke the "ongoing investigation" exemption of § 2006, an employer must carefully adhere to the many requirements found in the Act and elaborated upon in the Regulations. One misstep causes the tightrope walker to plummet to earth,

i.e., to suffer the loss of the exemption: "Failure to satisfy any of the specified requirements nullifies the statutory authority for polygraph test administration and may subject the employer to the assessment of civil money penalties and other remedial actions...." 29 C.F.R. 801.12(h) (1996). Stated another way, if an employer loses the exemption, the employer then comes face to face with the EPPA's broad prohibition on polygraph testing found at § 2002.

**19.** Whether the test took place on June 26, 27, or 28, 1996, is in some dispute, though not material to the instant Motions.

her "right to obtain and consult with legal counsel or an *employee representative*," 29 U.S.C. § 2007(b)(2)(A) (Supp.1996) (emphasis added), not a *company representative.* The Court rejects this argument not as mere semantic hairsplitting but rather as specious. Even without dissecting the disjunctive nature of the phrase, the Court notes that the term "employee representative," which is not defined in the EPPA or the Regulations, probably refers to the type of representative found in union or other collective-bargaining settings.[20] No evidence has been presented to suggest that Defendant even has an "employee representative" with whom Plaintiff could have consulted if she had wanted to.

■ As for Plaintiff's third and fourth issues, she argues that Defendant violated § 2006(d)(4), which permits an employer to request that an employee submit to a polygraph if

> (4) the employer executes a statement, provided to the examiner before the test that—
>
>> (A) sets forth with *particularity* the specific incident or activity being investigated and the basis for testing particular employees, . . . and
>>
>> (D) contains at a minimum—. . .
>>
>>> (iii) a statement describing the basis of the employer's reasonable suspicion that the employee *was involved* in the incident or activity under investigation.

*Id.* § 2006(d)(4)(A) & (D) (Supp.1996) (emphases added). Plaintiff hangs her third argument on the following statement in the "48–Hour Notice": "We have reason to believe that you *may have knowledge of or* *involvement in* the theft of the drinks in question." Thus, she says, Defendant failed to inform Plaintiff that she *was involved,* as required by § 2006(d)(4)(D)(iii).

The Court rejects Plaintiff's argument as based on an incomplete reading of the "48–Hour Notice," which also states:

> On 6/10, 1996, the company acquired the services of an investigator to conduct shopping investigations at Mango's Tropical Cafe. During the investigation the investigator reported that on several different occasions you served drinks and did not ring them up on the register therefor [sic] causing an economic loss to the company. This theft has resulted in an economic loss of over $20.00 to this company. During your examination it will be explained to you in detail what we know to date.

(Def.'s Notice of Filing Dep. and Exs., Ex. 2) (D.E.# 16.) The Court finds that the above-quoted material suffices, even under the narrow construction required to be given EPPA provisions, to inform Plaintiff that Defendant believed she *was involved* in a theft.

■ Plaintiff's fourth and final argument poses a far more serious challenge to Defendant's adherence to EPPA procedures. Plaintiff argues, not without reason, that the last sentence of the above-quoted material— "During your examination it will be explained to you in detail what we know to date[,]" (Def.'s Notice of Filing Dep. and Exs., Ex. 2) (D.E.# 16)—implies that Defendant failed to explain the allegations in detail—i.e., "with particularity"—in the "48–Hour Notice." This raises the following question. Is the level of detail in the "48–Hour Notice"[21] sufficient to meet the requirement that an employee's specific activity be "set[ ] forth

---

20. *See, e.g.,* Labor Management Relations Act, 1947, 29 U.S.C. § 152, which states in relevant part:

> (4) The term "representatives" includes any individual or labor organization.
>
> (5) The term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

21. That the statement referred to under § 2006(d)(4) must be given to the employee forty-eight hours in advance of the polygraph exam is clear. The Act itself does not so specify. And Regulations § 801.12(a)(4) states only that "[t]he employer provides the examinee with a statement . . . *prior to* the test," 29 C.F.R. § 801.12(a)(4) (1996) (emphasis added). Nevertheless, Regulations § 801.12(g)(2) states, "The statement required under paragraph (a)(4) of this section must be received by the employee at least 48 hours, excluding weekend days and holidays, prior to the time of the examination." 29 C.F.R. § 801.12(g)(2) (1996).

with particularity"? The Regulations provide some guidance:

> The statement to be provided to the employee must set forth with particularity the specific incident or activity being investigated and the basis for testing particular employees. Section 7(d)(4)(A) [of the EPPA, Pub.L. 100–347, *codified at* 29 U.S.C. § 2006(d)(4)(A) ] requires specificity beyond the mere assertion of general statements regarding economic loss, employee access, and reasonable suspicion. For example, an employer's assertion that an expensive watch was stolen, and that the employee had access to the watch and is therefore a suspect, would not meet the "with particularity" criterion. If the basis for an employer's requesting an employee (or employees) to take a polygraph test is not articulated with particularity, and reduced to writing, then the standard is not met.

29 C.F.R. § 801.12(g)(3) (1996).

The Court finds that the "48–Hour Notice" constitutes more than the equivalent of "an expensive watch was stolen and ... the employee had access to the watch."[22] The "48–Hour Notice" is a written document that contains the date (June 10, 1996) and the specific activity being investigated (Plaintiff was observed on several occasions serving drinks and not ringing them up on the regis-

ter). The Regulations further specify that the statement from employer to employee must contain the date and time that the statement was received by the employee, as well as the employee's signature. 29 C.F.R. §§ 801.12(g)(2) & 801.23(a)(1) (1996). The "48–Hour Notice" in the Court record contains those elements. *(See* Def.'s Notice of Filing Dep. and Exs., Ex. 2) (D.E.# 16.)

Even if the "48–Hour Notice" itself were deemed to not meet the "with particularity" criterion, Defendant has met that criterion nonetheless. Nothing in the Act or the Regulations requires that the detailed statement bé *in* a document called "48–Hour Notice." Rather, the Regulations require only that the statement "be received by the examinee at least forty-eight hours, excluding weekend days and holidays, before the time of the examination." 29 C.F.R. § 801.23(a)(1) (1996). *See also,* 29 C.F.R. § 801.12(g)(2) (1996) (stating same using different words). Plaintiff "received" the Spotter's Report, quoted at length *supra,* at part I, on June 17, 1996, (Long Aff. ¶ 9) (D.E.# 21), which is at least nine days before the earliest date (June 26, 1996) on which the test might have been given. Therefore, Defendant provided Plaintiff with a statement that "set[ ] forth with particularity" the specific incident or activity being investigated.[23]

---

**22.** The holding in *Wiltshire v. Citibank,* 171 Misc.2d 250, ——, 653 N.Y.S.2d 517, 524 (N.Y.Sup.Ct.1996) ("Literal compliance with the provisions of Section 2006[d] is required to take a[sic] employer out of the basic prohibition on using polygraphs provided in the EPPA."), is not to the contrary. There, the court denied defendant's motion for summary judgment and granted plaintiff's cross-motion for summary judgment as to liability. The defendant's written statement to plaintiff, the court states, was "grossly inadequate under the EPPA," where "the substance of the written statement is only that plaintiff has access." *Id.* Defendant argued that its notice to plaintiff was sufficient because plaintiff had been informed *orally* of all the facts defendant knew regarding plaintiff's alleged involvement in a fraudulent wire transfer of bank funds. It is in the context of those facts, unlike the facts in the instant case, where Defendant gave Plaintiff written documents, that the *Wiltshire* court ruled as it did.

Similarly, in *Mennen v. Easter Stores,* 951 F.Supp. 838, 852 (N.D.Iowa 1997) ("[T]he EPPA's provisions clearly provide that an em-

ployer's failure to follow all of the listed procedures and guidelines will constitute a forfeiture of the ongoing investigation exemption and will result in liability under the EPPA."), the court was dealing with the complete absence of a written statement. *Lyle v. Mercy Hospital Anderson,* 876 F.Supp. 157, 162 (S.D.Ohio 1995) (Defendant "may only claim the ongoing investigation exemption by demonstrating that it meets all the elements of the exemption, including the procedural elements listed in § 2006(d)(4)."), also involved no written statement from employer to employee.

**23.** That the Spotter's Report does not contain the elements required by Regulations §§ 801.12(a)(4), 801.12(g)(2), and 801.23(a)(1) does not alter the Court's finding. The purpose of the written-notice requirement is not to test Defendant's ability to read and mechanically follow the rules set out in the Code of Federal Regulations. Rather, the purpose is to "afford the employee sufficient time prior to the test to obtain and consult with legal counsel or an employee representative." 29 C.F.R. § 801.12(g)(2) (1996). *See also* 801.23(a)(1) (1996) (stating

## V. PLAINTIFF'S MOTION TO AMEND COMPLAINT

Plaintiff seeks to amend her Complaint, pursuant to Federal Rule of Civil Procedure 15(a), in order to add Defendant's owner, David Wallack, as co-defendant, to add a cause of action for defamation against both Mango's and Mr. Wallack, and to add additional violations of the EPPA against Mango's. (Pl.'s Mot. to Amend Compl.) (D.E.# 15.) Plaintiff asserts that she learned of the additional wrongs only after filing the initial Complaint.[24] The Motion was filed on January 15, 1997, the last day on which to amend the pleadings as agreed to in the parties' Joint Scheduling Report. (Joint Sched. Report ¶ D) (D.E.# 5.) Because Defendant filed an Answer on August 15, 1996, (Def.'s Answer) (D.E.# 4), Rule 15(a) requires Plaintiff to seek the Court's leave to amend.[25]

Defendant objects to the amendment, arguing that it is filed in bad faith ("as a dilatory attempt to avoid the entry of a Summary Judgment and the imposition of Rule 11 SANCTIONS,") (Def.'s Resp. in Opp'n to Mot. to Amend at 4) (D.E.# 23); is futile (Mr. Wallack is insulated from slander liability because the statements are true and Plaintiff admits them to be true) (*id.* at 5–6); and fails to present "substantial and convincing evidence" to warrant amendment subsequent to the filing of a motion for summary judgment (*id.*).

The Court, finding that the amended claims are not clearly futile and that no prejudice will accrue to Defendant from allowing Plaintiff to amend, grants Plaintiff leave to amend.

## VI. CONCLUSION

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that:

1) Defendant's Motion For Summary Judgment be and is hereby DENIED;

2) Plaintiff's Cross–Motion For Partial Summary Judgment be and is hereby DENIED.

3) Plaintiff's Motion To Amend Complaint be and is hereby GRANTED.

4) Defendant's Motion For Rule 11 Sanctions be and is hereby DENIED.

5) Plaintiff's Motion For Rule 11 Sanctions be and is hereby DENIED.

It is FURTHER ORDERED that Plaintiff shall file a First Amended Complaint with the Clerk of Court within fifteen days of the date of this Order; Defendant shall respond to the First Amended Complaint within ten days of being served therewith.

---

same using different words). That purpose was served: By Plaintiff's account, she received the Spotter's Report on June 17; was told, by manager Susan Eidelman, on June 17, to submit to a polygraph or lose her job; received the "48–Hour Notice" on June 21; and took the polygraph on June 28. (Long Aff. ¶¶ 9–13.)

**24.** She submits the affidavit of a former Mango's employee, Sheryl Bouchard, in support of the new claims. In the affidavit, dated January 17, 1997, and filed February 3, 1997, Ms. Bouchard states factual matter that apparently forms the basis of Plaintiff's new allegations. Plaintiff does not explain, and Defendant does not make an issue of, the delay between Ms. Bouchard's learning of these matters on August 7, 1996, (*see*

Bouchard Aff. ¶ 3) (D.E.# 28), and the filing of the Motion To Amend Complaint on January 15, 1997. Without question, however, Ms. Bouchard could not have learned of the matters to which she testifies in her affidavit until after Plaintiff filed her Complaint, on July 31, 1996.

**25.** Federal Rule of Civil Procedure 15(a) states in relevant part:

A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served.... Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.